STATE, Appellant, v. MICHELS PIPELINE CONSTRUCTION, INC., and others, Respondents.*

*No. 355. Argued March 6, 1974.—Decided May 7, 1974.*
(Also reported in 217 N. W. 2d 339 and 219 N. W. 2d 308.)

* Motion for rehearing denied, without costs, on June 28, 1974.

280

282

For the appellant the cause was argued by *Richard J. Boyd,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondents there was a joint brief by *Schroeder, Gedlen, Riester & Moerke* and *Ewald L. Moerke, Jr.,* and *Lewis A. Posekany, Jr.,* attorneys for Metropolitan Sewerage Commission of the County of Milwaukee and Metropolitan Sewerage District of the County of Milwaukee; *Paul J. Burbach,* attorney for Michels Pipeline Construction, Inc.; *James B. Brennan,* Milwaukee city attorney, *Richard F. Maruszewski,* assistant city attorney, and *Patrick B. McDonnell,* assistant city attorney, attorneys for Sewerage Commission of the City of Milwaukee; and *Robert P. Russell,* corporation

counsel, and *James J. Bonifas,* deputy corporation counsel, attorneys for Milwaukee county; all of Milwaukee; and oral argument by *Ewald L. Moerke, Jr.,* for respondent Metropolitan Sewerage Commission of the County of Milwaukee, and *Mr. Burbach* for respondent Michels Pipeline Construction, Inc.

A brief amicus curiae was filed by *Harold H. Fuhrman* and *Wickert & Fuhrman,* attorneys, and *John P. Roemer* of counsel, all of Milwaukee, for Root River Action Committee, Inc.

A brief was filed by *Robert W. Warren,* attorney general, and *Richard J. Boyd,* assistant attorney general, for the appellant.

A joint brief was filed by *Schroeder, Gedlen, Riester & Moerke* and *Ewald L. Moerke, Jr.,* and *Robert Arthur Melin,* attorneys for Metropolitan Sewerage Commission of the County of Milwaukee and Metropolitan Sewerage District of the County of Milwaukee; *Paul J. Burbach,* attorney for Michels Pipeline Construction, Inc.; *James B. Brennan,* Milwaukee city attorney, *Richard F. Maruszewski,* assistant city attorney, and *Patrick B. McDonnell,* assistant city attorney, attorneys for Sewerage Commission of the City of Milwaukee; and *Robert P. Russell,* corporation counsel, and *James J. Bonifas,* deputy corporation counsel, attorneys for Milwaukee county; all of Milwaukee; for the respondents.

A brief amicus curiae was filed by *Harold H. Fuhrman* and *Wickert & Fuhrman,* attorneys, and *John P. Romer* of counsel, all of Milwaukee, for Root River Action Committee, Inc.

WILKIE, J. Two issues are raised by this appeal:

1. Does the complaint state facts sufficient to allege a *public* nuisance?

2. Assuming the answer to the first issue is yes, does the complaint state facts sufficient to constitute a cause of action?

### *Public nuisance.*

The defendants assert that the scope of the injury alleged in the complaint here does not constitute a "public nuisance." They contend that a public nuisance differs significantly from a private nuisance in terms of the nature and scope of the conduct involved and its consequences.

Public nuisance is described in Wood on Nuisances [4] as follows:

"Sec. 18. **Uses of property creating.**—In order to make the use of property in a particular manner a public nuisance, it must be to the common annoyance of the public—that is, it must be so extensive in its consequences that they cannot be said to be confined to a few persons; or it must be in a public place, as on a public road or street, so as to seriously offend and annoy those who lawfully pass. . . ."

"Sec. 19. . . . there must be the same degree of injury and damage that would be necessary to maintain a suit for damages, with this addition: that the injury and damage resulting therefrom must be so extensive as to affect many persons at one and the same time, so that the injury can fairly be said to result to citizens as a part of the public, rather than to them individually. . . ."

"Sec. 20. **Public character and effects of nuisance must be established.**—It is not necessary to establish the fact that the ill effects are applicable to an entire community, or that they are the same in their effects upon all who come within their influence, or that the same amount or degree of damage is done to each person affected by it, for in the very nature of things this would be impossible.

[4] 1 Wood, *Nuisances* (3d ed. 1893), ch. II, pp. 39, 42, 43, 44, secs. 18–20.

Those in the immediate vicinity of the erection or thing complained of might sustain a special injury and damage for which they could maintain a private suit, while others might sustain no special injury apart from the rest of the community, and thus would have no redress, except through the intervention of a public prosecution. It is sufficient to show that it has a common effect upon many as distinguished from a few. . . ."

American Jurisprudence [5] has this to say about the number of persons affected:

"Sec. 10. **Character as determined by number of persons affected.**
". . . The courts have frequently stated that the injury from a nuisance, in order to constitute the nuisance a public one, must affect 'the public,' or 'the public generally,' or 'the citizens generally.' But it is admittedly a difficult question to tell whether a nuisance is so general in its character—that is, affects a sufficient number of persons—to justify its characterization as a 'public nuisance.' . . . No doubt a nuisance is public if it affects the entire community or neighborhood, or any considerable number of persons, or if it occurs in a public place or where the public frequently congregate or where numbers of the public are likely to come within the range of its influence. . . ."

A recent California case [6] found that the operators of a dairy were creating a public nuisance where 11 persons who owned twelve and one-half lots in a 51 lot tract were affected thereby. The court found that this number constituted a considerable number of persons in the neighborhood and thus the manner in which the dairy was operated was a public nuisance.

However, there are authorities which take a more restrictive view of what constitutes a public nuisance. For example, Prosser [7] describes a public nuisance:

[5] 58 Am. Jur. 2d *Nuisances*, pp. 565, 566, sec. 10.

[6] *Wade v. Campbell* (1962), 200 Cal. App. 2d 54, 19 Cal. Rptr. 173, Annot. (1963), 92 A. L. R. 2d 966, 974.

[7] Prosser, *Law of Torts* (4th ed.), pp. 585, 586, ch. 15, sec. 88.

"To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several. Thus the pollution of a stream which merely inconveniences a number of riparian owners is a private nuisance only, but it may become a public one if it kills the fish. It is not necessary, however, that the entire community be affected, so long as the nuisance will interfere with those who come in contact with it in the exercise of a public right. The most obvious illustration, of course, is the obstruction of a public highway, which inconveniences only those who are travelling upon it. It is, furthermore, rather obvious that any condition or activity which substantially interferes with the private interests of any considerable number of individuals in a community is very likely to interfere also with some public right, such as the comfortable use of the highway; and for this reason the question of the number of persons affected has seldom arisen."

A recent New York case [8] follows this emphasis on the nature of the right invaded:

". . . The teachings of the statutes and the cases are that a public nuisance is an offense to the public of a neighborhood or community in the enjoyment of its common rights, as distinguished from activity which results merely in injury even to a large number of persons in the enjoyment of private rights not shared by the members of the community or neighborhood at large."

The Wisconsin cases define a public nuisance in terms of the scope of the injury and not in terms of the type of injury.

*Schiro v. Oriental Realty Co.*[9] quoted with approval this description of a public nuisance:

" '. . . As commonly used, it connotes a condition or activity which unduly interferes with the use of land or of a public place. Conduct which interferes solely with -

[8] *State of New York v. Wright Gallery* (1970), 64 Misc. 2d 423, 426, 427, 314 N. Y. Supp. 2d 661.

[9] (1956), 272 Wis. 537, 546, 76 N. W. 2d 355.

the use of a relatively small area of private land is tortious but not criminal and is called a private nuisance. Conduct which interferes with the use of a public place or with the activities of an entire community is called a public nuisance. This is criminal, and is also tortious to those persons who are specially harmed by it.' "

And in *Hartung v. Milwaukee County* [10] this court approved the definition in *Schiro* and stated that the plaintiffs had the burden of proving that a quarry whose operations were complained of impaired a substantial portion of the property and people in the city of Wauwatosa.

In *Boden v. Milwaukee* [11] this court quoted with approval from a Texas case which had held:

". . . 'For a nuisance to be a public one, it need not affect the whole community, but it is public if injury or annoyance affect the people of some local neighborhood, or are occasioned to such part of the public as come in contact with it.' . . ."

This definition narrows the number of persons who have to be affected if conduct is to constitute a public nuisance. The defendants here claim this quotation is inapplicable because the *Boden Case* dealt only with the question of the power of a municipality to legislatively declare something to be a public nuisance. The *Boden Case* involved the condemnation of certain buildings as public nuisances. The quotation from *Boden* is not limited to the facts of the *Boden Case*. Legislative bodies have great latitude in determining what is a public nuisance but they cannot declare something to be a public nuisance which is not one in fact. Therefore, the definition used in the *Boden Case* must be of general applicability.

The defendants also claim that in any event the state here did not allege that a "local neighborhood" was adversely affected. The complaint speaks in terms of nu-

[10] (1957), 2 Wis. 2d 269, 86 N. W. 2d 475, 87 N. W. 2d 799.
[11] (1959), 8 Wis. 2d 318, 329, 330, 99 N. W. 2d 156.

merous persons and the area adjacent to and near the project. Liberally construed the complaint does allege that the neighborhood surrounding the sewer project has been affected. Also it is clear that many authorities only require that a large number of persons be injured rather than a few. The allegations of the complaint certainly meet that requirement. Wood on Nuisances states that the question of whether the results of conduct are so common as to amount to a public nuisance is a question of fact for the jury.[12]

And in *State v. H. Samuels Co.*[13] this court recently said:

". . . If the public is injured in its civil or property rights or privileges or in respect to public health to any degree, that is sufficient to constitute a public nuisance; the degree of harm goes to whether or not the nuisance should be enjoined."

The "public" does not have to include all the persons of the community but only a sufficiently large number of persons, as alleged here.

### Cause of action.

The trial court granted the demurrer of the defendants-respondents on the basis that the case of *Huber v. Merkel*[14] established that there is no cause of action for interference with ground water. This is a correct statement of the holding of that case. In *Huber v. Merkel* an owner of real estate attempted to have another landowner in his vicinity enjoined from wasting and unreasonably using water from artesian wells on the person's property. The defendant allowed his wells to flow continuously, the excess simply spilling on the ground

[12] 1 Wood, *Nuisances* (3d ed. 1893), ch. II, p. 45, sec. 22.

[13] (1973), 60 Wis. 2d 631, 638, 211 N. W. 2d 417.

[14] *Supra,* footnote 1.

and this adversely affected the artesian pressure of all the wells which tapped the same aquifer. This court held that it was the almost universal consensus of judicial opinion that:

". . . If the waters simply percolate through the ground, without definite channel, they belong to the realty in which they are found, and the owner of the soil may divert, consume, or cut them off with impunity. If, on the other hand, the subterranean waters flow in a defined channel, the rules which govern the use of surface streams apply; but the presumption is that the waters are percolating waters until it is shown that they are supplied by a definite, flowing stream." [15]

The court went on to find that malicious intent did not affect this right.

". . . it seems clear that it must be held that the appellant had a clear right at common law, resulting from his ownership of land, to sink a well thereon, and use the water therefrom as he chose, or allow it to flow away, regardless of the effect of such use upon his neighbors' wells, and that such right is not affected by malicious intent. Whether this right results from an absolute ownership of the water itself, as stated in some of the authorities, or from a mere right to use and divert the water while percolating through the soil, is a question of no materiality in the present discussion. In either event, it is a property right, arising out of his ownership of the land, and is protected by the common law as such." [16]

The *Huber Case* did not discuss the basis or rationale for this common-law rule but merely asserted that this was the rule and adopted it. The case has been severely criticized, not only by dissenting justices from this court, [17]

---

[15] *Id.* at page 357.

[16] *Id.* at page 363.

[17] Mr. Chief Justice EDWARD T. FAIRCHILD and Mr. Justice GEORGE R. CURRIE said in their dissent in *Menne v. Fond du Lac, supra,* footnote 3, at page 346: "The plaintiffs in this case seek the aid of equity in protecting their property rights in the per-

but also by text writers [18] and in the opinions of other jurisdictions. [19] Much of the criticism was directed at the holding that even malice did not divest a landowner of his absolute right to the use of ground water. It is generally conceded that this aspect of the case was probably a misstatement or at least an extension of the cases which had applied the common law or "English rule" up to that time. All of the prior cases had dealt with nonwasteful, nonmalicious use of water.

In 1956 this court was faced with two companion cases which sought to change the holding of *Huber v. Merkel.* In *Fond du Lac v. Empire* [20] and *Menne v. Fond du Lac* [21] this court refused to change the rule adopted in *Huber v. Merkel.* However, in the *Menne Case* this court did acknowledge the severe criticism the case had received, directed mainly toward the issue of malicious intent. However, because malice was not involved in the *Menne Case* the court did not feel it necessary to give attention to such criticism. And the court again did not really discuss the basis of the rule it was reaffirming or evaluate the differing position of many other jurisdictions on the subject. The court merely indicated that whatever the arguable merits of change, it should come from the legislature.

What is the basis of the English or common-law rule? The basis for this rule of absolute ownership of percolating ground water was a feeling that the ways of underground water were too mysterious and unpredictable to

colating waters from which they draw their water supply. They are entitled to such protection regardless of whether or not the legislature ever exercises its police power to regulate percolating waters."

[18] 3 Farnham, *Waters and Water Rights*, p. 2718, sec. 938.

[19] *Erickson v. Crookston Waterworks Power & Light Co.* (1907), 100 Minn. 481, 489, 111 N. W. 391; *Hathorn v. Natural Carbonic Gas Co.* (1909), 194 N. Y. 326, 87 N. E. 504.

[20] *Supra,* footnote 2.

[21] *Supra,* footnote 3.

allow the establishment of adequate and fair rules for regulation of competing rights to such water. So the English courts adopted the position that everyone was permitted to take and use all of which they could get possession.

In *Acton v. Blundell* [22] the English courts held the law of surface waters did not apply to percolating ground water because:

". . . no man can tell what changes these underground sources have undergone in the progress of time . . . . therefore, . . . there can be no ground for implying any mutual consent or agreement, for ages past . . . which is one of the foundations on which the law as to running streams is supposed to be built . . . ."

And the early American case of *Roath v. Driscoll* [23] said with regard to percolating water:

". . . The laws of its existence and progress . . . cannot be known or regulated. It rises to great heights, and moves collaterally, by influences beyond our apprehension. These influences are so secret, changeable and uncontrollable, we cannot subject them to the regulations of law, nor build upon them a system of rules, as has been done, with streams upon the surface."

And again in *Haldeman v. Bruckhart* [24] the Pennsylvania court said:

". . . A surface stream cannot be diverted without knowledge that the diversion will affect a lower proprietor. Not so with an unknown subterraneous percolation or stream. One can hardly have rights upon another's land which are imperceptible, of which neither himself or that other can have any knowledge."

Even in 1903 when the *Huber v. Merkel Case* was written, the awe of mysterious, unknowable forces beneath the earth was fast becoming an outmoded basis for

[22] (Ex. 1843), 12 Mees. & W. 324, 350, 351, 152 Reprint 1223.
[23] (1850), 20 Conn. 533, 541.
[24] (1863), 45 Pa. 514, 519.

a rule of law. The court in *Huber v. Merkel* discussed the subject of artesian water with a certain degree of sophistication. However, artesian water may have been better understood than other types of percolating ground water. However, today scientific knowledge in the field of hydrology has certainly advanced to the point where a cause and effect relationship can be established between a tapping of underground water and the level of the water table in the area so that liability can be fairly adjudicated consonant with due process. Our scientific knowledge also establishes the interdependence of all water systems.

". . . The hydrologic cycle traces all existing water from the oceans to the atmosphere, to the land and ultimately back to the oceans. In nature, there is an inseparable relationship between all water, whether in the atmosphere, on the earth's surface, or under the earth's surface." [25]

It makes very little sense to make an arbitrary distinction between the rules to be applied to water on the basis of where it happens to be found. There is little justification for property rights in ground water to be considered absolute while rights in surface streams are subject to a doctrine of reasonable use. The *Huber v. Merkel Case* certainly gives no explanation of why a property right in ground water should be an exception to the general maxim—*sic utere tuo ut alienum non laedas.*[26]

Also, although at the time of the decision of *Huber v. Merkel* the English rule did probably prevail, it was not a common-law rule of venerable, entrenched and ancient origin. The first decisions which enunciated the doctrine were decided in the early 1840's only a short time before Wisconsin achieved statehood. The application of the rule was still developing at the time Wisconsin

[25] J. H. Beuscher, *Wisconsin's Law of Water Use*, 31 Wis. Bar Bull. (Oct. 1958), p. 30.

[26] Use your own property in such a manner as not to injure that of another.

adopted it as the "almost universal consensus of judicial opinion." Soon thereafter other American jurisdictions began to reject the English common-law rule in favor of what has come to be known as the American rule or the reasonable use doctrine. Even New York, upon whose cases the Wisconsin court heavily relied in *Huber v. Merkel,* rejected the English rule within a few years.[27] Now as pointed out in the appellant's brief there are 25 states which adhere to the reasonable use doctrine and three which have adopted the even broader correlative rights doctrine. Thus the weight of authority in this country no longer supports the English rule of absolute possession. To highlight the fluidity of the law at the time Wisconsin decided the case of *Huber v. Merkel* one need only read the following passage from a treatise on water rights written only one year after that decision.[28]

". . . The law with respect to rights in percolating waters was not developed until a comparatively recent period. And all the rules governing the subject cannot be regarded as settled at the present time. In the first place, the courts are not agreed as to the nature of the right in such water, if any exists. . . . The fact is that because of the difficulty of the attempt to formulate general rules to govern the ownership of, and rights in, percolating water, the courts have endeavored to escape that responsibility, and in doing so have stated different reasons for their action which do not harmonize well when brought together. There is no reason why the use of such water should not be brought within definite rules the same as any other class of property. . . . It has been said that there are no correlative rights existing between proprietors of adjoining lands in reference to the use of water in the earth or percolating under its surface. . . . But the attempt to act upon that doctrine very soon forces the conclusion that percolating water is not an exception

---

[27] *See People v. New York Carbonic Acid Gas Co.* (1909), 196 N. Y. 421, 90 N. E. 441.

[28] 3 Farnham, *supra,* footnote 18, at pages 2710, 2711, 2712, sec. 935.

to the general rule that rights in organized society are not absolute, but correlative, and that one man cannot be permitted to exercise any right if the direct effect of his act will be an injury to his neighbor."

### *Stare decisis.*

As was mentioned earlier, the court in *Menne v. Fond du Lac* did not actually decide to retain the doctrine of *Huber v. Merkel* but rather stated that if change was desirable it should come from the legislature.

". . . Assuming, however, but without deciding, that the *Huber* decision did not correctly state the common law, it did state a rule that was reached and is adhered to in several other states and which is often referred to as the common-law rule. It determined that the use of percolating water underneath an owner's land is a property right and that water so obtained could be sold. We have operated thereunder for more than fifty years. Property rights thereunder have been acquired and sold. Under the rule of *stare decisis,* where property rights are involved, the courts are reluctant to engage in judicial legislation. If there is to be a change, it should come by action of the legislature. We know that the legislature is studying the problem and we can expect such legislation as it deems advisable in the interests of all of the people in the state." [29]

However, in several later cases this court did much to make clear that *stare decisis* is not an inflexible restraint, but merely a cautionary rule. In several cases, as pointed out by the appellant in its brief, this court has made dramatic changes in common-law rules even though earlier cases had refused to do so saying such change was up to the legislature.[30] In *Holytz v. Milwaukee* [31] this court said:

[29] *Menne v. Fond du Lac, supra,* footnote 3, at page 345.

[30] *See: Holytz v. Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618.

[31] *Id.* at page 37, quoting from *Kojis v. Doctors Hospital* (1961), 12 Wis. 2d 367, 372, 107 N. W. 2d 131, 107 N. W. 2d 292.

" '. . . The rule of *stare decisis,* however desirable from the standpoint of certainty and stability, does not require us to perpetuate a doctrine that should no longer be applicable in view of the changes in present-day charitable hospitals.' "

And in *Bielski v. Schulze* [32] the court discussed the meaning of art. XIV, sec. 13, of the Wisconsin Constitution: [33]

". . . In any event, we cannot adopt the view that sec. 13, art. XIV of our constitution prohibited this court from now adopting common-law principles or of changing them. Inherent in the common law is a dynamic principle which allows it to grow and to tailor itself to meet changing needs within the doctrine of *stare decisis,* which, if correctly understood, was not static and did not forever prevent the courts from reversing themselves or from applying principles of common law to new situations as the need arose. If this were not so, we must succumb to a rule that a judge should let others 'long dead and unaware of the problems of the age in which he lives, do his thinking for him.' . . ."

And in *State v. Esser* [34] this court said:

" '. . . Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice.' "

The respondents, however, urge that *stare decisis* is adhered to more often in cases involving property rights. In *Wilcox v. Wilcox* [35] this court said:

"The rules of *stare decisis* attempt to give certainty to our law, so conduct can be planned in light of foresee-

[32] (1962), 16 Wis. 2d 1, 11, 114 N. W. 2d 105.

[33] Wis. Const. art. XIV, sec. 13: "Such parts of the common law as are now in force in the territory of Wisconsin, not inconsistent with this constitution, shall be and continue part of the law of this state until altered or suspended by the legislature."

[34] (1962), 16 Wis. 2d 567, 582, 115 N. W. 2d 505, quoting from 11 Am. Jur., *Common Law,* p. 154, sec. 2.

[35] (1965), 26 Wis. 2d 617, 622, 133 N. W. 2d 408.

able legal consequences. Certainty, however, is less relevant in the law of unintentional torts, where conduct is not planned, than in the law of contracts or, more particularly, in the law of real property."

And more recently in *Gottlieb v. Milwaukee* [36] this court said:

"Moreover, we have made it clear that this court, in general, would depart from *stare decisis* only where unintentional conduct was involved and then only when there were compelling reasons for altering a *court-made* rule. *Estate of King* (1965), 28 Wis. (2d) 431, 137 N. W. (2d) 122. In *Wilcox v. Wilcox* (1965), 26 Wis. (2d) 617, 623, 133 N. W. (2d) 408, we pointed out our reluctance to deviate from precedent where rules of contract or property were involved."

However, the above cases do not say that *stare decisis must* be adhered to wherever a change would affect property rights. The cases indicate that caution must be used in this area and that any changes in the common law be well considered by this court.

In the present case the proposed change is not confiscatory in nature. It merely brings this type of property (percolating ground water) in line with the general limitation on all use of property embodied in the law of nuisance. There is a basic inconsistency in saying that a person has a property right in underground water that cannot be taken without compensation, for, when he exercises that right to the detriment of his neighbor, *he* is actually taking his neighbor's property without compensation.

It is also true that the doctrine of *Huber,* although enunciated in 1903, has not been reaffirmed in a long line of cases. In *State v. Surma* [37] this court said that courts are less prone to apply the doctrine of *stare decisis* to a single decision as distinguished from a line of decisions

[36] (1967), 33 Wis. 2d 408, 431, 147 N. W. 2d 633.
[37] (1953), 263 Wis. 388, 57 N. W. 2d 370.

adhering to the same principle. This is especially true where none of the three cases discussing rights in percolating ground water actually discuss or approve the rationale of the common-law rule. The respondents say that because only three cases involving this question have come before the court, the problem of ground water is not significant and there is no pressing need for change. We are not convinced by this argument. If even one person is turned away remediless, justice has been denied.

One aspect involved in considering whether or not to make a change in present doctrine was not discussed by any party to this appeal. That aspect is the relationship between the rule and statutes on the subject. In *Fond du Lac v. Empire* [38] this court gave as one reason for striking down village ordinances restricting the use of ground water in the village limits the fact that the ordinances were in conflict with secs. 144.03 and 66.066 (1a), Stats. 1955, which authorized municipalities to acquire water sources and necessary transmission lines beyond their corporate limits.

However, it is not clear that a proposed "reasonable use doctrine" would be in conflict with any existing state statutes. For, although a particular activity may be authorized and therefore lawful, this does not exempt it from the doctrine of nuisance. In *Jost v. Dairyland Power Cooperative* [39] this court said:

". . . To contend that a public utility, in the pursuit of its praiseworthy and legitimate enterprise, can, in effect, deprive others of the full use of their property without compensation, poses a theory unknown to the law of Wisconsin, and in our opinion would constitute the taking of property without due process of law."

The respondents in their brief and during oral argument discussed the importance of this particular sewer

---

[38] *Supra,* footnote 2.

[39] (1969), 45 Wis. 2d 164, 177, 172 N. W. 2d 647.

project and its public utility as a reason for not making any change in the common-law doctrine of rights in percolating ground water. They urged that its consequences on their project was justification for not making any change. However, their arguments were addressed actually to the substantive question of whether, in fact, their particular use is "reasonable" and what type of relief may be available.

The appellant points out that in its action it did not ask that the project be abated. Certainly the utility and necessity of this project would be relevant factors on the question of whether abatement would be proper as a remedy. What the appellant asked was that the respondents be ordered to take steps to eliminate or ameliorate the hardship and adverse effects of the project upon the citizens affected by it. The appellant has argued persuasively that the increased cost of, for example, furnishing a water supply to the affected parties would spread the social cost of the project over the larger community which would be benefited by the sewer project instead of leaving the burden wholly on the adjacent landowners.

For the reasons discussed above, we overrule our decision in *Huber v. Merkel* and for that reason we find it necessary to adopt a rule of law more in harmony with present scientific and legal principles.

## *What rule should be adopted.*

What rule should this court now adopt as to the use of percolating ground water? There are three distinct doctrines applied in various American jurisdictions regarding rights in percolating water: [40]

(a) The English or common-law rule:

". . . the person who owns the surface may dig therein, and apply all that is there found to his own purposes

---

[40] C. J. S., *Waters*, pp.770–773, sec. 93 (c).

at his free will and pleasure; and if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbor's well, this inconvenience to his neighbor falls within the description of damnum absque injuria, which cannot become the ground of an action. . . ."

There is one limitation that the actions may not be motivated by malice and waste of water can be actionable. Although framed in property language this doctrine is really a rule of capture. The landowner may sell and grant his right to withdraw the water to others.

(b) Reasonable Use:

As stated in Corpus Juris Secundum:

"In some states, the rule of the common law followed in early decisions has given way to the doctrine of reasonable use limiting the right of a landowner to percolating water in his land to such an amount of water as may be necessary for some useful or beneficial purpose in connection with the land from which it is taken, not restricting his right to use the water for any useful purpose on his own land, and not restricting his right to use it elsewhere in the absence of proof of injury to adjoining landowners. . . ."

(c) Correlative rights:

Again Corpus Juris Secundum defines this doctrine as:

"Under the rule of correlative rights, the rights of all landowners over a common basin, saturated strata, or underground reservoir are coequal or correlative, and one cannot extract more than his share of the water, even for use on his own land, where others' rights are injured thereby."

The amicus brief, submitted in this case by a group of the citizens affected by this sewer project, has printed the full text of the trial court decision overruling the respondents' demurrer to the *private* nuisance suit brought by the affected landowners. In that opinion the court states that the "reasonable use" rule as stated in Corpus

Juris Secundum is the one to be applied to the facts of the case.

In many early cases the two doctrines of reasonable use and correlative rights seem to have been mixed together as the "American rule." [41] However, as Corpus Juris Secundum makes clear, they are two distinct doctrines. According to the appellant's brief only three states adhere to the correlative rights doctrine. This doctrine applies the basic rules of the reasonable use doctrine, but calls for apportionment of underground water where there is not a sufficient supply for all reasonable uses. We are not shown here that water conditions in Wisconsin are so critical as to necessitate the adoption of this doctrine. Also the administrative difficulties of a court trying to make such an apportionment would militate against its adoption.

The "reasonable use" doctrine has been widely adopted in the United States. However, a close reading of the language of the doctrine shows that it is not a very radical departure from the common-law rule. It still contains quite a broad privilege to use ground water. The respondents in their brief seem to misunderstand the real scope of the "reasonable use" rule as it has been applied. On page 11 of their brief they state:

". . . In this case, the right being claimed by the plaintiff is the right to put down any type of well the owner wishes and be assured thereafter that no one else will use the aquifer in a manner that will affect that well's production. Such a property right does not and should not exist in Wisconsin."

This is not the impact of the reasonable use doctrine. This is because the term "reasonable" has a very special restricted meaning. A waste of water or a wasteful use of water is not unreasonable only if it causes harm, and a use of water that causes harm is nevertheless reasonable

---

[41] Annot. (1928), 55 A. L. R. 1390, and cases cited therein.

if it is made in connection with the overlying land. The withdrawal of water for use elsewhere for beneficial purposes such as municipal supply or domestic supply is not "reasonable" in this special sense, but such removal may be made without liability if no harm results.

Thus it can be seen that the scare story of the respondents is not true. One may sink a well for domestic use or other use on his land without liability to his neighbors for effects on their wells as long as he acts without malice and is not wasting water to their detriment.

The "reasonable use" rule basically only affords protection from cities withdrawing large quantities of water for municipal utilities. The rule forces cities to pay those affected by such excessive use damages or the cost of new wells and pumping equipment and is very much in accord with policies of loss distribution and requiring the beneficiaries of harmful activities to pay the costs thereof. However, under the rule there is no apportionment of water as between adjoining landowners. If water is withdrawn for a beneficial use on the land from which it is taken there is no liability for any harm to adjoining property owners. In effect, the rule gives partial protection to small wells against cities or water companies, but not protection from a large factory or apartment building on the neighboring land.[42]

We choose not to adopt any of the three rules here discussed, but rather to adopt the rule set forth in Tentative Draft No. 17 of the Restatement of the Law Second, *Torts,* as proposed on April 26, 1971, for adoption by the American Law Institute.[43] The revisors of this section

---

[42] *See also:* Ellis, *Water-Use Law and Administration in Wisconsin* (1970), sec. 5.04, p. 91, for situations where there is no protection under present Wisconsin law.

[43] Restatement of the Law Second, *Torts,* Tentative Draft No. 17, April 26, 1971, sec. 858A, pp. 151–162, replacing secs. 858, 859, 860, 861, 862, 863 of the Restatement of the Law of Torts.

indicated that they felt the rules set forth in the Restatement of the Law First, *Torts,* were a curious mixture of both the "reasonable use" and "correlative rights" doctrines, but without the idea that any beneficial use on the overlying land was reasonable. Also apportionment of water was on the basis of a balancing of utility against harm, rather than on the equality of right that underlies the correlative rights doctrine.[44]

Sec. 858A significantly changes the rule of the Restatement of Law First, and broadens the protection of the "reasonable use" rule. As stated in the analysis section of the proposal:[45]

"*Analysis.* The rule adopted in this Topic can be described as the American rule with its protection broadened. It gives more or less unrestricted freedom to the possessor of overlying land to develop and use ground water and it permits the grant and sale of ground water to persons who need water but do not possess land overlying it. It does not attempt to apportion the water among users except to the extent that the special conditions of underground streams and interconnected ground and stream water permit it to be done on a rational basis. It gives the protection of the American rule to owners of small wells harmed by large withdrawals for use elewhere, but extends that protection in proper cases to harm done by large withdrawals for operations on overlying lands."

The proposed section of the Restatement Second reads as follows:[46]

"Sec. 858A. **Non-liability for use of ground water— exceptions.**
"A possessor of land or his grantee who withdraws ground water from the land and uses it for a beneficial purpose is not subject to liability for interference with the use of water by another, unless

[44] *Id.* at page 162.
[45] *Id.* at page 155.
[46] *Id.* at page 156.

"(a) The withdrawal of water causes unreasonable harm through lowering the water table or reducing artesian pressure,

"(b) The ground water forms an underground stream, in which case the rules stated in sec. 850A to 857 are applicable, or

"(c) The withdrawal of water has a direct and substantial effect upon the water of a watercourse or lake, in which case the rules stated in secs. 850A to 857 are applicable."

Thus the rule preserves the basic expression of a rule of nonliability—a privilege if you will—to use ground water beneath the land. The formulation of the exception to this basic rule recognizes that there is usually enough water for all users so that apportionment is not necessary but that the problem is who shall bear the costs of deepening prior wells, installing pumps, paying increased pumping costs, etc., necessitated by a lowering of the water table by a large user. The common law placed the burden of making improvements on each user. The "reasonable use" rule gives protection to existing wells if the water withdrawal is taken off the land for use elsewhere but not if the water is used for beneficial purposes on the overlying land. The proposed rule of the Restatement Second would place the matter of cost on the same rational basis as the rule applicable to surface streams, the reasonableness of placing the burden upon one party or the other.

The comment on the meaning of "unreasonable harm" as used in the Restatement rule explains that as in other situations, reasonableness will vary with the circumstances. Later users with superior economic resources should not be allowed to impose costs upon smaller water users that are beyond their economic capacity. The comment also addresses itself to the fear of the respondents that a change in the rule concerning use of percolating water will allow the first user to dictate the depth of wells and the water table to all later users. The comment ex-

plains that it is usually reasonable to give equal treatment to persons similarly situated and to place similar burdens on each. To quote from the comment: [47]

". . . If the first farmer to sink an irrigation well finds his facility is inadequate when other farmers irrigate their lands, he has not been unreasonably harmed by them if he is fcrced to deepen his well to the same level as theirs and pay the same pumping costs when the water level drops. Furthermore, his own withdrawals have contributed to the lowering of the water table. On the other hand, uses of water for domestic purposes and stock watering will not ordinarily justify the cost of deep wells and expensive pumps, and unreasonable harm is usually caused to the person making such uses when the water table is materially lowered or artesian pressure is destroyed. In these cases the withdrawals of the harmed water users are usually minuscule and they have not materially contributed to the situation causing the harm. In many such cases the solution is for the person causing the harm to supply the needs of the person harmed from his large withdrawals or from an alternate source, and placing liability on the person causing the harm will encourage this result. . . ."

In adopting the rule proposed in the Restatement of Torts, we necessarily overrule the order of the trial court sustaining the demurrer here, and we remand for further proceedings in the trial court.

*By the Court.*—Order reversed and cause remanded for further proceedings not inconsistent with this opinion.

The following memorandum was filed July 3, 1974.

WILKIE, J. SUPPLEMENTAL OPINION *(on motion for rehearing).* Our original opinion overruled the decision of *Huber v. Merkel* (1903), 117 Wis. 355, 94 N. W. 354, and adopted the rule set forth in Tentative Draft No. 17 of the Restatement of the Law Second, *Torts,* as proposed on April 26, 1971, and identified as "Sec. 858A. **Non-liability for use of ground water—exceptions.**"

[47] *Id.* at page 158.

Since the filing of that opinion, this court has given further consideration to whether the overruling of the decision of *Huber v. Merkel* and the adoption of a new rule should be made prospective only. *See: Kojis v. Doctors Hospital* (1961), 12 Wis. 2d 367, 107 N. W. 2d 131, 107 N. W. 2d 292 (charitable immunity) ; *Holytz v. Milwaukee* (1962), 17 Wis. 2d 26, 115 N. W. 2d 618 (governmental immunity) ; *Widell v. Holy Trinity Catholic Church* (1963), 19 Wis. 2d 648, 121 N. W. 2d 249 (religious immunity) ; *Goller v. White* (1963), 20 Wis. 2d 402, 122 N. W. 2d 193 (parental immunity).

"The general rule adhered to by this court is the 'Blackstonian Doctrine.' This doctrine provides that a decision which overrules or repudiates an earlier decision is retrospective in operation." *Fitzgerald v. Meissner & Hicks, Inc.* (1968), 38 Wis. 2d 571, 575, 157 N. W. 2d 595.

However, this court has also recognized that various exceptions have been made to this doctrine and in so doing has stated:

". . . Retroactive operation has been sometimes denied where there has been great reliance on an overruled decision by a substantial number of persons and considerable harm or detriment could result to them. It has also been denied where the purpose of the new ruling cannot be served by retroactivity, and where retroactivity would tend to thrust an excessive burden on the administration of justice. 10 A. L. R. 3d 1384." *Fitzgerald, supra,* page 576.

We have concluded that there are compelling reasons for making the application of the rule adopted in the original opinion prospective only, except as to those individually named plaintiffs appearing as amici curiae, including others in the class in the related case of *Dale Nolte, et al. v. Michels Pipeline Construction, Inc.,* Case #441-610, Circuit Court, Milwaukee County, Wisconsin, whom they allege to represent, and further except as to causes of action arising on or after May 7, 1974, the date of the filing of our original opinion.