CARROLL D. BESADNY, Secretary Department of Natural Resources
You indicate that the Department of Natural Resources has been revising its prospecting and mining rules (chapters NR 131, 132 and 182 Wis. Adm. Code) in order to ensure that this activity will be regulated in the most environmentally sound manner. You and the American Indian Study Committee express concern about the enforceability of these administrative rules, in particular the groundwater provisions, within the boundaries of Wisconsin's Indian reservations. You ask my opinion regarding the state's regulatory authority over a prospecting or mining operation that may adversely affect groundwater given three different factual settings.
The jurisdictional relationship between the state and the Indian tribes and the federal government over environmental matters within the exterior boundaries of Indian reservations is not easily defined. The following analysis will show that in some situations and under varying circumstances both state and tribal governments may have jurisdiction over certain such matters. Your questions will be considered seriatim based upon the assumed facts stated.
 1. Prospecting or mining activity conducted off the reservation which may adversely affect groundwater under the reservation. Assume that the reservation boundary is within 1,200 feet of the waste site such that the reservation property line is the compliance boundary. The opinion should focus on our *Page 55 
ability to monitor groundwater flow within the reservation and to commence enforcement actions if a violation is detected.
The state's ability to enforce its prospecting and mining rules to prevent or correct groundwater contamination, where violations occur outside reservation boundaries, whether involving Indians or non-Indians, is not open to question. See, e.g., MescaleroApache Tribe v. Jones, 411 U.S. 145 (1973). This is true regardless of how the groundwater contamination is detected or where that detection occurs.
There is no absolute barrier to the exercise of state jurisdiction within reservation boundaries even though such jurisdiction may be qualified in some situations. The Supreme Court recently summarized the analytical framework utilized to determine under what circumstances a state's regulatory authority may lawfully be extended within reservation boundaries. In WhiteMountain Apache Tribe v. Bracker, 448 U.S. 136 (1980), the Court noted that it long ago departed from the early view that state laws can have no force within reservation boundaries. Rather, the question whether a particular state law may be applied within an Indian reservation or to tribe members requires a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.
The Court concluded:
 Congress has broad power to regulate tribal affairs under the Indian Commerce Clause, Art. I, § 8, cl. 3. [Citation omitted.] This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. [Citations omitted.] Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." [Citations omitted.] The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The *Page 56 
right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop," [citation omitted] against which vague or ambiguous federal enactments must always be measured.
448 U.S. at 142-43.
The application of these principles in resolving jurisdictional questions is materially affected by the status of the land tenure where enforcement is sought and the identity of the person or entity being regulated. For example, when on-reservation conduct involving only Indians is at issue, state law is generally inapplicable because the state's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest. See Bracker; Moe v. ConfederatedSalish Kootenai Tribes, 425 U.S. 463 (1976); McClanahan v.State Tax Commission of Arizona, 411 U.S. 164 (1973); Montana v.United States, 450 U.S. 544 (1981). In this situation, state laws generally are not applicable to tribe members or Indian activities on a reservation except where Congress has expressly provided that they shall apply. McClanahan, 411 U.S. at 170-71.
Where, however, the conduct involves only non-Indians, state law usually is applicable because of the state's legitimate interests in regulating the affairs of non-Indians. See, e.g.,People of State of N.Y. ex rel. Ray v. Martin, 326 U.S. 496
(1946); Draper v. United States, 164 U.S. 240 (1896); Utah Northern Railway v. Fisher, 116 U.S. 28 (1885). See generallyWilliams v. Lee, 358 U.S. 217 (1959); McClanahan. Therefore, each of these controlling principles — infringement and preemption — may effect a different result depending on the nature of the land tenure and the identity of the person or activity being regulated.
In this opinion, land tenure within the outer boundary of a reservation will be referred to either as "Indian land" or "fee land." Indian land includes land held in trust by the federal government, either for the Tribe or for individual Tribe members, together with land owned in fee by the Tribe and by Tribe members. Fee land refers to all land other than Indian land. *Page 57 
Each of your questions must be considered within this framework. The principal concern in your first question appears to be the state's ability to monitor groundwater flow within a reservation.
In my opinion the state has unqualified authority to monitor groundwater flow on fee land within reservation boundaries. Enforcement of the groundwater regulations at issue unquestionably is a proper exercise of the state's police power to protect, among other things, the health, safety or general welfare of all state citizens. Since groundwater is a shared resource, State v. Michels Pipeline Construction, Inc.,63 Wis.2d 278, 217 N.W.2d 339, 219 N.W.2d 308 (1974), that moves into and beyond tribal lands, a legitimate and important state interest would be impaired if the state was precluded from monitoring groundwater flow underneath fee lands. Monitoring groundwater under fee lands would not, in my opinion, unlawfully infringe upon any tribal interest or interfere with internal tribal relations. Nor would such activity interfere with any federal interest. There is no comprehensive federal regulatory scheme for monitoring groundwater within reservations and the federal environmental statutes (see below) are essentially silent with regard to the question of state authority over environmental matters within reservation boundaries.
State authority to monitor or to exercise other forms of jurisdiction over groundwater under Indian land is less clear. There are no federal statutes or regulations that are specifically concerned with groundwater protection on Indian lands (or other lands) within reservation boundaries. The federal government through the Department of Interior, Bureau of Indian Affairs, has adopted regulations regarding mining activities on Indian lands within reservation boundaries. See 25 C.F.R. subch. I (1982). These regulations, however, do not address the concerns for groundwater management and protection that are an integral part of the state's prospecting and mining administrative rules.
The Indian Health Service, an agency within the Department of Health and Human Services, is primarily responsible for determining water quality and for providing water and sewerage systems for Indians on Indian reservations. In carrying out its responsibilities in this regard, the Indian Health Service utilizes the Environmental Protection Agency's drinking water standards. It does not, however, *Page 58 
enforce any rules or regulations that are designed to prevent groundwater contamination.
Federal environmental legislation does not for the most part evince an intent to preempt state authority over groundwater protection on Indian land within reservation boundaries. Until recent amendments in 1977, the legislative history of the various federal environmental acts was completely devoid of mention of Indian tribes. The first major environmental statute enacted — the Clean Air Act Amendments of 1970 (42 U.S.C. §§ 1857-58a (1970) — contains no mention of Indians. The Solid Waste Disposal Act, as amended in 1970 (42 U.S.C. §§ 3251-59 (1970)), now recodified as amended by the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §§ 6901-87 (1977)), did include Indian tribes within the definition of the term "municipality" but contained no other mention of Indians or Indian tribes. The Federal Water Pollution Control Act, asamended in 1972 (33 U.S.C. §§ 1251-1376 (Supp. 1975)), contained the same mention of Indians only in the definition of the term "municipality." The Noise Control Act of 1972 (42 U.S.C. §§ 4901-18 (Supp. 1975)) and the Federal Insecticide, Fungicide and Rodenticide Act, as amended in 1975 (7 U.S.C. §§ 136-136y (Supp. 1975)), made no mention of Indians. The Safe Drinking Water Act of 1975 (42 U.S.C. § 300f(10) (Supp. 1975)), returned to the inclusion of Indians in the "municipality" definition. The Toxic Substances Control Act of 1976 (15 U.S.C. §§ 2601-29 (Supp. 1978)), made no mention of Indians. It was not until amendments to the Clean Air Act, the Federal Water Pollution Control Act and the Safe Drinking Water Act in 1977, that Congress ventured beyond the definitional sections to mention Indians in any substantive provisions, and then only cautiously.
For example, in the amendments to the Safe Drinking Water Act, Congress made clear its intentions concerning application of the Safe Drinking Water Act to federal facilities, clarified the issue of state jurisdiction over Indian lands and completely exempted the Bureau of Indian Affairs from the provisions of the Act. The amendments provided in part:
 (c)(1) Nothing in the Safe Drinking Water Amendments of 1977 shall be construed to alter or affect the status of American Indian lands or water rights nor to waive any sovereignty over Indian lands guaranteed by treaty or statute. *Page 59 
 (2) For the purposes of this chapter the term "Federal agency" shall not be construed to refer to or include any American Indian tribe, nor to the Secretary of the Interior in his capacity as trustee of Indian lands.
Safe Drinking Water Act Amendments of 1977, 42 U.S.C. § 300j-6
(C) (Supp. 1977).
Although this legislation, as indicated, is not directly concerned with the protection of groundwater, it does suggest that environmental concerns within reservation boundaries that affect Indians are the primary concern and responsibility of federal agencies such as the Bureau of Indian Affairs, the Indian Health Service and the Environmental Protection Agency, and the tribes themselves.
Unquestionably, an Indian tribe has an interest in monitoring any activity within its territorial jurisdiction, especially on Indian land, that "threatens or has some direct effect on the political integrity, the economic security or the health or welfare of the tribe." Montana, 450 U.S. at 566. Monitoring groundwater for the purpose of protecting the resource would undoubtedly meet this test. I do not know if any tribe in Wisconsin has established its own groundwater monitoring program. Since the Indian Health Service has responsibility for ensuring that drinking water from wells on Indian lands is safe, it is likely a more comprehensive tribal monitoring program has not been needed.
Although state monitoring of groundwater on Indian lands is not, in my opinion, clearly preempted or a clear infringement on tribal self-government, the state's interest in conducting this activity does not appear to be sufficient to overcome the general rule that prohibits the exercise of state jurisdiction on Indian lands without specific congressional authorization. I have not been apprised of any reason why it is essential for the state (as opposed to the Tribe or the federal government) to monitor groundwater under Indian lands. (See discussion regarding question no. 3.) Accordingly, it is my opinion that under the assumed facts and absent permission of the tribe or individual Indian landowner, the state is without authority to go upon Indian lands to monitor groundwater.
Because the tribes and the state share similar interests with regard to the protection of groundwater resources traveling beneath all reservation lands, the state should endeavor to enter into cooperative *Page 60 
intergovernmental agreements with the various tribal governments and appropriate federal agencies to ensure protection of the resource. Effective monitoring of groundwater under all land within a reservation will ensure enforcement of state, federal or tribal regulations that will protect the resource.
 2. Prospecting and mining activity conducted on non-Indian lands within the reservation which may adversely affect groundwater within and outside of the reservation.
Since the federal government has not undertaken comprehensive regulation of mining activities, in general, or groundwater, in particular, within reservation boundaries, federal preemption presents no barrier to the enforcement of Wisconsin's prospecting and mining rules as they relate to groundwater. Controlling, therefore, is whether enforcement of the administrative rules in question unlawfully infringes on the right of reservation Indians to make their own laws and be ruled by them.
In Montana the Court suggested that tribal government retains inherent power to exercise regulatory authority over the conduct of non-Indians on fee lands within reservation boundaries "when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566.
Undoubtedly, prospecting and mining activity that is conducted anywhere within reservation boundaries would meet this test. Arguably a tribal government, therefore, would have authority to enact regulations to govern such activity including provisions to protect its interest in the groundwater resources beneath Indian land. It does not necessarily follow, however, that enforcement of the state's prospecting and mining rules constitutes an unlawful infringement upon tribal self-government.
I am not aware of any tribe in Wisconsin that has enacted tribal ordinances or regulations to govern prospecting and mining activities within reservation boundaries. Until that occurs, it is not possible to determine whether the state's rules conflict in any way with the exercise of tribal self-government.
In my opinion the interests of the state and the tribes in protecting groundwater resources are similar if not identical. It therefore is my *Page 61 
opinion that enforcement of the state's prospecting and mining rules as they relate to groundwater on activity conducted on fee land within reservation boundaries is permissible.
 3. Prospecting and mining activity conducted within the reservation on Indian-owned lands which may adversely affect groundwater within and outside of the reservation.
I am not aware of any recent Supreme Court case upholding the exercise of state regulatory authority over Indians or Indian activity on Indian land within reservation boundaries absent specific congressional authorization. Undoubtedly any prospecting or mining on Indian owned lands would not occur without some tribal involvement even though non-Indians also may be involved. Because of this tribal involvement, it is likely that the exercise of state regulatory authority over such activity would infringe to some extent upon tribal self-government.
In Bracker the Court intimates that in an exceptional case a state's regulatory interest may be so compelling that a state could act even without specific congressional authorization. Unregulated prospecting or mining activity that will contaminate groundwater could present such an exceptional case. It is not possible to predict with certainty whether the exercise of state jurisdiction in such a case would be upheld. Although not settled, it is my opinion that where it can be conclusively shown that without state regulation prospecting or mining activity would contaminate groundwater moving beyond Indian lands thereby posing an immediate danger to public health, safety or the general welfare, such regulation is permissible.
BCL:JDN