Town of Stiles, Town of Lena and Village of
Lena, Petitioners-Respondents,

v.

Stiles/Lena Drainage District,
Respondent-Appellant.

Court of Appeals

*No. 2009AP556. Submitted on briefs November 17, 2009.
—Decided June 22, 2010.*

2010 WI App 87

(Also reported in 787 N.W.2d 876.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Timothy M. Barber* and *Peter J. Conrad* of *Axley Brynelson, LLP* of Madison.

On behalf of the petitioners-respondents, the cause was submitted on the joint brief of *James A. Morrison* of *James A. Morrison, S.C.* of Marinette, and *Timothy Schmid* of Shawano.

A nonparty brief was filed by *Paul G. Kent* of *Anderson & Kent, S.C.* of Madison, for Wisconsin Association of Drainage Districts.

Before Hoover, P.J., Peterson and Brunner, JJ.

¶ 1. BRUNNER, J. Stiles/Lena Drainage District appeals from an order granting the Town of Stiles, Town of Lena, and Village of Lena's (collectively the Municipalities) petition to dissolve the District. WISCONSIN STAT. § 88.82(3) precludes a circuit court from granting such a petition unless it first determines "that the public welfare will be promoted by dissolution of the district."[1] The District argues the circuit court improperly based its public welfare finding on the Municipalities' willingness to assume drainage responsibilities, the lack of popular support for the District, and the hostile and acrimonious relationship between landowners and the District. We agree.

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

## BACKGROUND

¶ 2. The District was established by order of the Oconto County Circuit Court on January 14, 1918. Its boundaries include the Village of Lena and parts of the Towns of Lena and Stiles. A three-member county drainage board appointed by the circuit court manages the District. *See* WIS. STAT. § 88.17. The District constructed three principal drainage ditches in the 1920's, but its history is plagued by periods of inactivity and dormancy. Prior to 2006, property owners within the District had not received drainage assessments since 1961.

¶ 3. The District resumed activity in 2001. Using funding from the Department of Agriculture, Trade and Consumer Protection (DATCP), the District re-mapped its boundaries, conducted a benefits reassessment, and prepared plans to bring the District into compliance with administrative regulations.[2] In 2007, the District's first documented inspection revealed all three primary drainage ditches needed substantial maintenance. In some places, weeds and vegetation obstructed the water flow.

¶ 4. Landowners petitioned the circuit court for dissolution of the District on August 6, 2007. The court held public hearings on the petition on November 17 and 20, 2008. Local officials, area residents, drainage experts, and drainage board members testified at the hearings.

¶ 5. Local officials spoke in favor of the petition. Richard Scott, the Stiles town chair, opined the drainage district was unnecessary. He further stated people in the Town of Stiles were in favor of dissolution, and the municipality was prepared to assume the District's responsibilities. Anthony Fetterly, a supervisor in the Town of Lena, agreed the Municipalities favored disso-

---

[2] *See generally* WIS. ADMIN. CODE ch. ATCP 48 (Oct. 2004).

lution and thought "the people can take care of the ditch just as well as the district can." Kenneth Linzmeyer, Village of Lena Board President, testified village residents preferred dissolution and wanted control of their drainage ditches.

¶ 6. Landowners generally testified that the District provided beneficial drainage, but expressed dissatisfaction with the District board. Charles Kehl, for example, stated, "I guess . . . I'm not so much in favor of the district being dissolved as the current board being removed, but I think that dissolution is . . . one way we can insulate ourselves from . . . the current board." Similarly, Mark Alden, a former board member, testified he was "in favor of dissolution with reservation":

> My problem with the drainage district is in leadership . . . . I know of literally thousands of acres that benefit from the drainage district.
>
> We have a critical problem with the leadership of the drainage district, and that's why I am in favor of dissolution . . . . [I]t's a leadership issue specifically, and I have a tremendous amount of respect for [District board chair] Murphy and what she's trying to do. Unfortunately, she does not represent the people that live in our district, and she has failed to be able to communicate effectively with them in representing their interests.

Alden further acknowledged the drainage district was beneficial to commercial farming. Residents also expressed concern about the cost of the proposed modifications and the potential loss of productive acreage to the District.[3]

---

[3] The landowners apparently referred to corridors required by state administrative regulations extending twenty feet from the top of the ditch bank in either direction. Wis. Admin. Code § ATCP 28.24(1), (2) (Oct. 2004).

¶ 7. Two drainage experts testified in opposition to the dissolution petition. Leonard Massie, a soil engineering specialist, testified the drainage system lowered the area's naturally high water table, which, in Massie's view, provided abundant benefits: "[A]gricultural production [is] enhanced for those who are farming, you have improved . . . timber production[,] . . . you clearly have more desirable species, [and] it supports the road system [and] tax base . . . ." Massie believed dissolution of the District "would be a disaster" because, under state law, ditches revert to public waterways over which no authority exercises dominion. A DATCP conservation engineer testified dissolution would foreclose opportunities to receive state drainage assistance and expertise.

¶ 8. Finally, all three board members testified dissolution would result in a gradual deterioration of the drainage system and a decrease in property values within the District. Board chair Rosalie Murphy stated "that the drainage district purpose has [not] changed any since [the District] was implemented . . . ." She testified dissolution would produce chaotic drainage efforts, major flooding, and poor agricultural yields. Board members Carl Porior and Hugh Magnin echoed her sentiments.

¶ 9. The circuit court found the District provided beneficial drainage and that future maintenance would be required "or there will be a heavy price to pay." Nonetheless, the court ordered the District dissolved, citing the Municipalities' offer to assume drainage responsibilities. The court analyzed public support for the dissolution petition, finding the substantial percentage of petitioning landowners and the position of all three Municipalities "material and worth considering." It also noted property owners' "feeling of frustration and inability to communicate with the membership of the

[D]istrict and the board" and found dissolution would relieve the "hostile, poisonous environment . . . between the public, the landowners and the board."

## DISCUSSION

¶ 10. This appeal requires us to determine, apparently for the first time, the meaning of WIS. STAT. § 88.82(3) and whether the facts found by the circuit court satisfy the statutory requirements for dissolution. Interpretation of a statute is a question of law we review de novo. *Christensen v. Sullivan*, 2009 WI 87, ¶ 42, 320 Wis. 2d 76, 768 N.W.2d 798. Whether dissolution will promote the public welfare is a mixed question of law and fact. We accept facts found by the circuit court unless clearly erroneous. WIS. STAT. § 805.17(2); *Sanitary Dist. No. 4 v. City of Brookfield*, 2009 WI App 47, ¶ 8, 317 Wis. 2d 532, 767 N.W.2d 316. Applying established facts to the legal standards governing dissolution presents an issue of law we determine independently. *Sanitary Dist. No. 4*, 317 Wis. 2d 532, ¶ 8. However, whether dissolution promotes the public welfare is a determination intricately woven with the factual findings. *See* WIS. STAT. § 88.03 (drainage proceedings are equitable in nature). We therefore give additional weight to the circuit court's decision, though we are not bound by it. *Leasefirst v. Hartford Rexall Drugs, Inc.*, 168 Wis. 2d 83, 89, 483 N.W.2d 585 (Ct. App. 1992); *Wassenaar v. Panos*, 111 Wis. 2d 518, 524–25, 331 N.W.2d 357 (1983) (appellate courts need not defer to trial court's determination on a question of law, but where legal conclusion is intertwined with factual findings supporting that conclusion, appellate court should give weight to the trial court's decision).

¶ 11. Before determining the validity of the circuit court's action, we must place that action in context.

WISCONSIN. STAT. ch. 88 authorizes the creation of drainage districts on petition by the owners of more than one-half the land area proposed for inclusion, or the majority of landowners owning at least one-third area in the lands proposed for inclusion. WIS. STAT. §§ 88.27(1)(a), (b). When an organization petition is filed, the court must appoint a drainage board to examine the lands and file a report. WIS. STAT. §§ 88.17(1), 88.29, 88.32. A circuit court may grant the petition only if organizing a district will promote the public health or welfare and if the proposed work will improve land within the district. WIS. STAT. §§ 88.34(3)(b), (c). The appointed drainage board manages the district and is authorized to levy assessments against landowners for costs of maintenance and repair of the drainage system. WIS. STAT. §§ 88.17(1), 88.23.

¶ 12. Drainage districts "are not by mere fact of creation . . . endowed with perpetual existence, but are at all times subject to change, modification, or death by their creator, the legislature." *Koshkonong Mud Creek Drainage Dist. v. Bodeman,* 197 Wis. 261, 265, 221 N.W. 864 (1928). Districts may terminate activity in a number of ways, including dissolution. Landowners representing sixty-seven percent or more of the confirmed benefits in a drainage district may petition for dissolution of the district. WIS. STAT. § 88.82(1)(b). The court must enter an order dissolving the district if it is satisfied the petition is signed by the required number of owners, the district's debts have been paid, and "the public welfare will be promoted by dissolution." WIS. STAT. § 88.82(3). The District does not contest the petition's validity or suggest it remains in debt. Its sole contention is that the circuit court improperly determined dissolution promotes the public welfare.

¶ 13. Wisconsin Stat. § 88.82(3) does not define "public welfare," but that term is used frequently throughout Wis. Stat. ch. 88. We must consider the context of a statutory phrase when determining its meaning. *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 46, 271 Wis. 2d 633, 681 N.W.2d 110. The phrase "public welfare" is used most frequently in relation to organization of a drainage district. A petition must set forth that the public health or public welfare will be promoted by drainage, as must the board's report on that petition and the circuit court's order organizing the district. Wis. Stat. §§ 88.28; 88.32; 88.34(3)(c).

¶ 14. The "public welfare" finding was not always required for organization of a drainage district. Early drainage laws required the circuit court to determine whether the drains "are necessary, or will be useful for the drainage of the lands proposed to be drained thereby, for agricultural, sanitary or mining purposes." 1891 Wis. Laws, ch. 401, § 5. The reference to the "public welfare" did not appear until after the supreme court decided *In re Theresa Drainage District*, 90 Wis. 301, 304, 63 N.W. 288 (1895), in which it invalidated the 1891 law as a prohibited taking of private property for private use:

> There is in the entire statute no expression or intimation that it was any part of the consideration upon which the improvement should be authorized that it should be either necessary or desirable to promote any public interest, convenience, or welfare. No doubt, such an improvement may be useful to some, or perhaps many, private owners of land, by way of increasing the usefulness and value of their lands. But that is merely a private advantage. It interests the public only indirectly and remotely, in the same way and sense in which

the public interest is advanced by the thrift and prosperity of individual citizens.

¶ 15. By 1929, the legislature had revised the drainage chapter to require a "public welfare" finding both when organizing a district, WIS. STAT. § 1379–17 (1911), and upon dissolution, 1929 Wis. Laws, ch. 339, § 1. The purpose of those requirements is to guarantee that the relevant act does not inure to the benefit of private owners or entities without also serving or promoting some overarching public interest. *See Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 494–95, 71 N.W.2d 420 (1955); *Huber v. Merkel*, 117 Wis. 355, 366–67, 94 N.W. 354 (1903), *overruled on other grounds by State v. Michels Pipeline Constr., Inc.*, 63 Wis. 2d 278, 298, 217 N.W.2d 339 (1974). Thus, although the "public welfare" concept escapes precise definition, and necessarily involves consideration of numerous factors, it does not, in the context of WIS. STAT. ch. 88, permit reference to any benefit imaginable.

¶ 16. The circuit court in this case explicitly found the District provided necessary services that benefitted the general public and acknowledged a continuing need for those activities:

> One of the advantages of having such a district is to coordinate and make sure that you have uniformity across the district, and that's something that's going to be lost, but it's something that I think that with good cooperation between the town boards and the village board can be achieved . . . . [I]t won't be probably done as . . . efficiently, it won't be done as methodically, but ultimately, work will have to be maintained, and I think they have the ability to carry on and build upon the work that has been achieved thus far.
>
> . . . .

I do believe Ms. Murphy's testimony that a lot of work will have to be done in the future to make sure there isn't a failure of the system, but we've also heard from many of the landowners who have ditches going through their property that things are working now, there isn't a failure now, and I think the municipalities will be able to address problems in the future as they arise to make sure that the system doesn't fail.

. . . .

I don't think there [are] too many people here in the room that would dispute that the effort[s] of the board have been of value, the creation of the system has been valuable and that in some form or another, work will have to be done on the system in the future, or there will be a heavy price to pay . . . .

Despite these findings, the circuit court determined the District's dissolution promoted the public welfare.

¶ 17. As the above excerpts from the circuit court's decision indicate, it relied heavily on the Municipalities' assurances that they would assume responsibility for maintaining the drainage system. Yet if the petitioners simply wanted to transfer control of District operations, the proper procedural vehicle would have been WIS. STAT. § 88.83, which allows landowners or the governing body of a city or village to petition for transfer of drainage responsibilities to the municipality. Dissolution does not shift those functions to another entity; instead, drains become "common waterways for the use of all landowners in the dissolved district" and for which no supervising authority retains control. WIS. STAT. § 88.82(6). Although the Municipalities claimed they were willing to assure adequate drainage, nothing in the record obligates the Municipalities to continue operating the District, and, indeed, individual landowners supporting the petition argued they could maintain

drainage on their property as well as anyone.[4] Despite recognizing the necessity of continued drainage, the circuit court failed to consider the chaotic drainage efforts the District's absence was likely to produce. With no formal charge or authority, the claimed willingness of other entities to assume drainage duties has little bearing on whether elimination of the District will promote the public welfare.

¶ 18. The circuit court also premised its public welfare determination on its finding that the District was disesteemed among area residents. This reasoning essentially renders dissolution a popularity contest between the district and taxed landowners. WISCONSIN STAT. § 88.82 already requires a threshold showing of undesirability by requiring that landowners representing at least sixty-seven percent of the confirmed benefits in the district support the dissolution petition. The "public welfare" inquiry becomes a nullity if petitioners need only demonstrate the district's disfavored status. We strive to give each phrase in a statute independent meaning so that no word is redundant or superfluous. *See Pawlowski v. American Family Mut. Ins. Co.*, 2009 WI 105, ¶ 22, 322 Wis. 2d 21, 777 N.W.2d 67. To give effect to the entire statute, we conclude a district's popularity is not an appropriate measure of whether dissolution promotes the public welfare.

¶ 19. Finally, the circuit court determined dissolution would relieve the "hostile, poisonous environment . . . between the public, the landowners, and the

---

[4] Counsel for the Municipalities consistently misstated the legal effect of dissolution by implying to witnesses the transfer of authority from district to municipality was automatic. As we have established, dissolution abolishes the district entirely and does not transfer those functions to any other authority. *See* WIS. STAT. § 88.82(6).

board." Again, this finding cannot support a conclusion that dissolution promotes the public welfare. The mere fact of a dissolution petition's filing creates a conflict between the petitioners and the drainage district. Yet the legislature mandates dissolution only under specific circumstances—where the public welfare is promoted. A circuit court's desire to end discord cannot supply the basis for its public welfare finding because, in every case, dissolution will eliminate the conflict. Petitioners must demonstrate something more than an acrimonious relationship with the district to satisfy their obligation under WIS. STAT. § 88.82(3).

¶ 20. Disregarding the circuit court's rationales for dissolution, we are left with the following findings: (1) the District provides beneficial drainage to the community; (2) the drainage system will require extensive future maintenance; and (3) dissolution would defeat the desirable coordination and uniformity achieved by the District. These findings are adequately supported by the record and establish, as a matter of law, that the District's dissolution does not promote the public welfare. We therefore reverse and remand to the circuit court for entry of an order dismissing the dissolution petition.

*By the Court.*—Order reversed and cause remanded with directions.