ANTONIEWICZ and wife, Respondents, v. RESZCZYNSKI and another, Appellants.

*No. 602 (1974). Argued October 2, 1975.—*
*Decided December 10, 1975.*
(Also reported in 236 N. W. 2d 1.)

838

For the appellants there was a brief by *de Vries, Vlasak & Schallert, S. C.* of Milwaukee, and oral argument by *Stephen de Vries*.

For the respondents there was a brief by *Salza, Penegor & Hauke S. C.* of Milwaukee, and oral argument by *Thomas A. Hauke*.

HEFFERNAN, J. This case presents the question of whether this court should abrogate the heretofore existing common-law immunities of the owners and occupiers of land. We conclude that the distinction between the duty heretofore owed by a land occupier to licensees and to invitees should be abolished, and that the duty of the land occupier be that required in any negligence action—ordinary care under the circumstances. We decline, however, to change the immunities which a land occupier enjoys in respect to trespassers.

This case arises upon demurrer. The court interpreted the allegations of the complaint to demonstrate that the plaintiff had the status of a licensee and, under existing law, there would be liability only where a trap exists upon the property, *i.e.*, a hazard known to the landowner but concealed and unknown to the licensee, or, alternatively, where there has been active operational negligence. The trial judge concluded that, although the law heretofore existing in Wisconsin precluded the plaintiff from recovery, such law was archaic and no rational basis existed for denying liability to the plaintiff in the circumstances set forth. He held that the duty which de-

volves upon a landowner, irrespective of the common-law status of the person who comes upon the land, ought to be that of ordinary care under the circumstances. The trial judge correctly interpreted the status of the law and the result that would be reached were prior law applied.

The complaint alleges that the plaintiff, Dean Antoniewicz, went to the home of the defendant, Anne Reszczynski, on the evening of February 16, 1973, for the purpose of giving the defendant's daughter a ride to a friend's house; and that on the back porch there was an icy patch, which was known to the defendant but was unknown to the plaintiff and upon which ice the plaintiff slipped and was injured. It is alleged that the defendant was guilty of negligence for failing to warn the plaintiff of the condition of the porch, for the failure to provide proper lighting, and for the failure to prevent the accumulation of ice on the back porch.

The trial judge in his memorandum opinion stated the arguments of the defendant. He said:

"Defendant contends that the injured plaintiff was a licensee; that the alleged defect was unconcealed; and therefore, there was no duty to warn, and that the condition complained of was not the product of active negligence. If one concedes the injured plaintiff's status as a licensee and that the condition was not alleged to be concealed, then the defendant's position is substantiated by the precedent she relies upon."

The judge then restated the common-law distinctions between the status of trespasser, licensee, and invitee and the tests this court applies for holding a landowner liable when an injury is done to a plaintiff in any of those legal categories. He pointed out that the common-law status of a licensee is important in determining the sufficiency of the cause of action only were common-law

distinctions to be retained. He posed the question: Should the trend toward the rule of ordinary negligence be adopted in Wisconsin? He answered that question by concluding that it was time that the antiquated common-law distinctions be rejected and a single negligence standard, that of the duty of ordinary care, govern an owner's liability for any injuries on his premises.

In the recent case of *Terpstra v. Soiltest, Inc.* (1974), 63 Wis. 2d 585, 218 N. W. 2d 129, the plaintiff urged that we abandon the existing rules for predicating liability upon an owner or occupier of land and substitute therefor the standard of ordinary care. We declined that request and stated:

"We are aware of the recent trend in other states toward the abolition of the common law distinctions between trespasser, licensee, and invitee in terms of the landowner's obligations . . . .

"We choose, however, not to consider the abandonment of the traditional rule in this case. If a change is to be considered, it should be on the basis of a record made at trial, where appropriate motions are made and instructions requested that will trigger the exercise of the trial judge's decision on the question as it may apply to a particular case." (Pp. 593, 594)

Ordinarily, as we said in *Gonzales v. Wilkinson* (1975), 68 Wis. 2d 154, 158, 227 N. W. 2d 907, we will not consider the abandonment of a traditional rule unless there has been a full trial and full consideration of the issues. In many cases where there has been an order entered on a demurrer, the trial judge may fail to address himself directly to the question of whether an existing rule of law should be abandoned.

As a matter of judicial policy, this court believes it important to have the expression of a trial judge's reason-

ing on the particular case before him. In the instant case, however, it is apparent that the trial judge specifically and painstakingly addressed himself to the policy considerations underlying the existing law and the approach that he espoused. His reasoning was explicated in a scholarly and exhaustive opinion. There is no doubt that, in light of this record, the trial judge squarely found the issue presented and dealt with it. He has fully informed this court why, in his opinion, the law applying to this case should be changed. The case is in a proper posture for the consideration of the issue upon which the trial judge made his decision and ordered that the demurrer be overruled.

The present law in Wisconsin in respect to the duties of owners and occupiers of land is outlined in *Szafranski v. Radetzky* (1966), 31 Wis. 2d 119, 125, 126, 141 N. W. 2d 902. We stated that, in respect to a trespasser, the owner of land has only the duty to refrain from wilful and intentional injury. He is not ordinarily liable to trespassers for the failure to exercise ordinary care to put his land in a safe condition, nor is he obliged to refrain from activities that might cause injury, although in some circumstances there may be a duty to warn known trespassers of highly dangerous conditions.

On the sliding scale of increased duty, as determined by the status of a person who comes upon the land, greater obligations are owed to a licensee. The land occupier may be liable to a licensee if the injury is caused by a trap—a dangerous condition that is known to the landowner but concealed from the licensee. In such circumstance, there is a duty to warn. A cause of action by a licensee may also be spelled out when the injury is caused by the active or operational negligence of the land occupier. Under such circumstances, the active or operational activity must be carried on in the exercise of ordinary care.

The highest duty is owed to the invitee, that of ordinary care under the circumstances.

A trespasser is defined by Restatement, 2 *Torts* 2d, p. 171, sec. 329, as:

". . . a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise."

A trespasser, however, is not ipso facto an outlaw, unless he is in fact on the premises for illegal purposes. That this is true is demonstrated by the numerous rules stated in Prosser, *Torts* (hornbook series, 4th ed.), which afford some protection under particular circumstances to "frequent trespassers," "anticipated trespassers" in respect to dangerous activities, "discovered trespassers," and "physically trapped" trespassers. There are also exceptions to the general rule of liability involving trespassing children of tender years.

Nevertheless, the trespasser's status is entirely different than that of either a licensee or an invitee, both of whom enter the property with knowledge and consent of the landowner. While a convincing argument can be made to demonstrate that the numerous exceptions to the trespasser rule vitiate its effect and warrant an abrogation of the rule and the substitution therefor of a duty of ordinary care that recognizes the peculiar circumstances surrounding the trespass, we conclude that the distinction is so great between that legal status and that of the licensee-invitee that we ought not consider now the abrogation of the rule in regard to trespassers. Under the facts of this case, the plaintiff was not a trespasser, but was a licensee. The duty to a trespasser is not raised.

In light of the factual situation herein, we agree with the Minnesota Supreme Court in *Peterson v. Balach* (1972), 294 Minn. 161, 199 N. W. 2d 639, in which, discussing a case in which the injured party was a licensee,

it declined to rule on a landowner's duty to trespassers. The Minnesota court said:

"Judicial restraint suggests that this question be deferred to a later day and to another case. Our judgment dictates that rules which have evolved over decades of common-law experience in this state should not be summarily abrogated except in an adversary setting after a thorough and careful presentation by litigants who have a stake in the outcome.

". . . Sweeping away all distinctions between trespassers and social guests and business invitees is a drastic step to take because there may be, and often is, good reason to distinguish between a trespasser and a social guest. There is little or no reason to distinguish between a social guest and a business invitee." (Pp. 164, 165)

The Massachusetts Supreme Court in *Mounsey v. Ellard* (1973), 363 Mass. 693, 297 N. E. 2d 43, followed a similar rationale in refusing to abrogate the trespasser rule. That court said in footnote 7, page 707:

"We feel that there is significant difference in the legal status of one who trespasses on another's land as opposed to one who is on the land under some color of right—such as a licensee or invitee. For this reason, among others, we do not believe they should be placed in the same legal category."[1]

Whatever logic there may be for the total abolition of all classifications of those who come upon the land of

---

[1] We are not unmindful of the concurring opinion of Mr. Justice KAPLAN in *Mounsey*, who felt that the logic of the argument abolishing the distinction between licensees and invitees was equally persuasive in respect to trespassers. He said:

"For it is sometimes just as hard to distinguish trespassers from licensees and invitees, as to distinguish licensees from invitees; and the class of trespassers is probably just as various as either of the other classes." (pp. 717, 718)

It is also interesting to note that the Massachusetts court, although retaining the trespasser status, later adopted the reasonable-care standard for "physically trapped" trespassers. *Pridgen v. Boston Housing Authority* (Mass. 1974), 308 N. E. 2d 467.

another, we are satisfied that the merits of total abolition should be considered by a common-law court only in a case involving a trespasser. Accordingly, we do not by this opinion intend to make any disposition of the immunity rule in respect to trespassers. On the facts before us, we are concerned only with the distinction between invitees and licensees.

In *Copeland v. Larson* (1970), 46 Wis. 2d 337, 174 N. W. 2d 745, this court discussed the standard for determining the status of an invitee to whom is owed the duty of ordinary care. Two theories have been developed— the "economic-benefit" theory which embraces a business visitor and the "invitation" theory. As *Copeland* points out:

"The economic-benefit test imposes an obligation upon the occupier of land when he receives some actual or potential benefit as a result of the entry. The invitation theory imposes a duty based upon a holding out of the premises as suitable for the purpose for which the visitor entered." (P. 342)

*Copeland* reiterates that the economic-benefit theory is not followed in Wisconsin and that this state finds liability to the invitee in a representation implied from an encouragement the landowner gives to others to further one of his purposes.

"To this court, the terms 'business invitee,' 'business visitor,' and 'invitee' are synonyms and we have held that when a person enters upon the premises of another and there is a benefit to the other person by the entry or some mutuality of interest, the visitor is an invitee." (Pp. 342, 343)

It is apparent from the discussion in *Copeland* that, with the discarding of the economic-benefit theory, it is logically impossible to set realistic standards for the exclusion of a social guest from the category of invitee. As we said in *Szafranski, supra,* one of the enigmas of common-law parlance is that a social guest, no matter

how cordially he has been invited, is nevertheless not an invitee but a licensee, to whom the lesser duty of care is required.

It is this blurring of distinctions and the absence of a sound rationale for imposing liability in one case and not in another that has impelled common-law courts to abolish the distinctions between licensee and invitee as determinative of liability. The trend toward the enlargement of the duty of landowners for negligence and the minimization of the importance of common-law status categories has been noted in both *Copeland, supra,* and *Terpstra, supra.*

The first significant change in this direction was made by the United States Supreme Court in *Kermarec v. Compagnie Generale* (1959), 358 U. S. 625, 79 Sup. Ct. 406, 3 L. Ed. 2d 550, a case in which the court considered whether the common-law rules of status in respect to one who comes upon the property of another should be applied to maritime law. Upon the premise that it is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care toward those lawfully aboard the vessel who are not members of the crew, the court concluded that it was inappropriate to hold that a different and lower standard of care is required when the ship's visitor is a "licensee." The court in rejecting that separate standard of care stated:

"The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion

and conflict. As new distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all the circumstances.' " (Pp. 630, 631)

Nine years later, *Rowland v. Christian* (1968), 69 Cal. 2d 108, 117, 70 Cal. Rptr. 97, 443 Pac. 2d 561, relying in part upon *Kermarec*, abolished the common-law status categories and stated:

"There is another fundamental objection to the approach to the question of the possessor's liability on the basis of the common law distinctions based upon the status of the injured party as a trespasser, licensee, or invitee. Complexity can be borne and confusion remedied where the underlying principles governing liability are based upon proper considerations. Whatever may have been the historical justifications for the common law distinctions, it is clear that those distinctions are not justified in the light of our modern society and that the complexity and confusion which has arisen is not due to difficulty in applying the original common law rules— they are all too easy to apply in their original formulation—but is due to the attempts to apply just rules in our modern society within the ancient terminology." (P. 117)

"A man's life or limb does not become less worthy of protection by the law nor a loss less worthy of compensation under the law because he has come upon the land of another without permission or with permission but without a business purpose. Reasonable people do not ordinarily vary their conduct depending upon such matters, and to focus upon the status of the injured party as a trespasser, licensee, or invitee in order to determine the question whether the landowner has a duty of care, is contrary to our modern social mores and humanitarian values. The common law rules obscure rather than illuminate the proper considerations which should govern determination of the question of duty." (P. 118)

Following this rationale, the California court concluded that continued adherence to the common-law dis-

tinctions would lead only to further injustice and additional legal fictions, with the resulting complexity and blurring of categories, except in the most obvious cases. It concluded that in all instances the proper standard to be applied in determining the liability of an occupier of land in respect to one who comes upon it is whether in the management of the property the occupier:

". . . has acted as a reasonable man in view of the probability of injury to others, and, although the plaintiff's status as a trespasser, licensee, or invitee may in the light of the facts giving rise to such status have some bearing on the question of liability, the status is not determinative." *Rowland,* page 119.

It should be noted that *Rowland* did what we do not do in this case—it abolished the special rules in respect to trespassers.

A year later, the state of Hawaii followed *Rowland* and in *Pickard v. City and County of Honolulu* (1969), 51 Hawaii 134, 135, 452 Pac. 2d 445, abolished the common-law distinctions. The Hawaiian court stated:

"We believe that the common law distinctions between classes of persons have no logical relationship to the exercise of reasonable care for the safety of others. We therefore hold that an occupier of land has a duty to use reasonable care for the safety of all persons reasonably anticipated to be upon the premises, regardless of the legal status of the individual."

In 1971, the Supreme Court of Colorado in *Mile High Fence Co. v. Radovich* (1971), 175 Colo. 537, 489 Pac. 2d 308, also ruled that the liability of a land occupier for those injured upon his property did not rest solely on the common-law status of the entrants. It concluded that the existing classifications created confusion and judicial waste and prevented the jury from applying ordinary community standards of negligence to a landowner's duty. It stated that the perpetuation of the common-law distinctions resulted in a harshness that is inappropriate

to a modern legal system. The Colorado court adopted the reasonable-man standard in view of foreseeability of injury to others. It acknowledged, however, that it was proper for the jury to predicate the question of liability on the circumstances of the individual's entry upon the land, *i.e.,* whether, in common-law parlance, he was a trespasser, licensee, or invitee, but those distinctions were not to be conclusive.

In 1972, the United States Court of Appeals for the District of Columbia in *Smith v. Arbaugh's Restaurant, Inc.* (D. C. Cir. 1972), 152 U. S. App. D. C. 86, 469 Fed. 2d 97, adopted a similar rule and held that it was appropriate to apply ordinary principles of negligence to a landowner's conduct.

The District of Columbia Court of Appeals emphasized that landowners are not to be insurers but are expected only to respond in liability if there is a failure to exercise due care under the circumstances.

The most recently reported case which completely adopted the *Rowland* rationale is *Mariorenzi v. Diponte, Inc.* (R. I. 1975), 333 Atl. 2d 127. The Rhode Island court said:

"The time has come to extricate ourselves from a semantical quagmire that had its beginning in ancient and misleading phraseology. Mr. Justice Sutherland has emphasized the judiciary's duty to bring the common law into accord with present day standards of wisdom and justice rather than to continue with some outmoded and antiquated rule of the past. . . . The judiciary gave birth to the invitee, licensee, trespasser trio and the judiciary can lay this triptych to rest. Accordingly, we now give a final but fitting interment to the common-law categories of invitee, licensee, internment and trespasser as well as their extensions, exceptions, and extrapolations.

"As we assign the trichotomy to the historical past, we substitute in its place the basic tort test of reasonableness. Hereafter, the common-law status of an entrant onto the land of another will no longer be determinative of the degree of care owed by the owner, but rather the

question to be resolved will be whether the owner has used reasonable care for the safety of all persons reasonably expected to be upon his premises. Evidence of the status of the invitee may have some relevance to the question of liability but it no longer will be conclusive. The traditional tort question of foreseeability will become important." (P. 133) (Atl. 2d) [2]

In addition to these cases which have totally abolished the common-law distinctions, a number of other courts, including Minnesota in *Peterson, supra,* and Massachusetts in *Mounsey, supra,* have abolished the traditional distinctions between licensees and invitees, but have declined to rule on the question of the landowner's duty toward trespassers.

Additionally, a number of courts since *Rowland* have declined to abolish the common-law categories but hold that social guests should be considered as invitees and the duty of reasonable care be required in respect to those persons who under the common-law categories fall into the class of either social guests or invitees. This trend in some cases preceded *Rowland, supra.* [3] A number

[2] For other cases adopting the *Rowland* test, see *Rosenau v. City of Estherville* (Iowa 1972), 199 N. W. 2d 125; *Sargent v. Ross* (1973), 113 N. H. 388, 308 Atl. 2d 528; *Ives v. Swift & Co.* (Iowa 1971), 183 N. W. 2d 172, 178 (concurring opinion); *Martinez v. Kaufman-Kane Realty Co., Inc.* (1974), 34 N. Y. 2d 819, 316 N. E. 2d 336 (concurring opinion); *Williams v. Town of Silver City* (1972), 84 N. M. 279, 502 Pac. 2d 304; *Taylor v. New Jersey Highway Authority* (1956), 22 N. J. 454, 126 Atl. 2d 313; *Cunningham v. Hayes* (Mo. App. 1971), 463 S. W. 2d 555; *Heald v. Cox* (Mo. App. 1972), 480 S. W. 2d 107; *Louisville Trust Co. v. Nutting* (Ky. 1969), 437 S. W. 2d 484.

[3] See, e.g., *Alexander v. General Accident Fire & Life Assurance Corp.* (La. App. 1957), 98 So. 2d 730, approved by the Louisiana Supreme Court in *Foggin v. General Guaranty Ins. Co.* (1967), 250 La. 347, 195 So. 2d 636; *Preston v. Sleziak* (1969), 16 Mich. App. 18, 167 N. W. 2d 477, citing *Polston v. S. S. Kresge Co.* (1949), 324 Mich. 575, 578, 37 N. W. 2d 638; *Bramble v. Thompson* (1972), 264 Md. 518, 287 Atl. 2d 265; *Snyder v. I. Jay Realty Co.* (1959), 30 N. J. 303, 153 Atl. 2d 1; *Scheibel v. Lipton* (1951), 156 Ohio St. 308, 328, 102 N. E. 2d 453.

of post-*Rowland* decisions have also expanded the category of invitees to include social guests.[4]

Prior to the trend of the change set in motion by *Rowland* and its progeny and concommitant with it, a number of writers of legal treatises and law reviews have pointed out the tenuous basis for the common-law categories that determine the responsibilities of occupiers of land.

2 Harper & James, in the treatise, *The Law of Torts*, p. 1432, sec. 27.1, stated the medieval origin of these rules. They said:

"But the consensus of modern opinion is that the special privilege these rules accord to the occupation of land sprang from the high place which land has traditionally held in English and American thought and the still continuing dominance and prestige of the landowning class in England during the formative period of this development. This sanctity of land ownership included notions of its economic importance and the social desirability of the free use and exploitation of land. Probably it also included, especially in England, more intangible overtones bound up with the values of a social system that traced much of its heritage of feudalism."

After discussing the application of the rules in respect to owners and occupiers of land, Harper and James concluded:

". . . the traditional rule confers on an occupier of land a special privilege to be careless which is quite out of keeping with the development of accident law generally and is no more justifiable here than it would be in the case of any other useful enterprise or activity. As we have suggested, this special privilege is receding . . . ." P. 1440, sec. 27.3.

In 1959, Graham Hughes in *Duties to Trespassers: A Comparative Survey and Revaluation*, 68 Yale Law

[4] *Wood v. Camp* (Fla. 1973), 284 So. 2d 691; *Sideman v. Guttman* (1972), 38 App. Div. 2d 420, 330 N. Y. Supp. 2d 263; *Hix v. Billen* (Fla. 1973), 284 So. 2d 209; *Mangione v. Dimino* (1972), 39 App. Div. 2d 128, 332 N. Y. Supp. 2d 683; *DiGildo v. Caponi* (1969), 18 Ohio St. 2d 125, 247 N. E. 2d 732.

Journal 633, in commenting upon the English statute which abolished the distinction between licensees and invitees, stated:

"This legislation sprang from a feeling, strongly expressed in recent years, that the character of the plaintiff in his lawful entry on the defendant's premises should be no more than a relevant circumstance in determining whether the defendant has discharged his duty of care. It ought not to be imported into the law as a categorical proposition, for the answer to the question of whether the defendant has discharged his duty should depend on the totality of the circumstances. The mechanical application of the traditional categories of visitor, and of such concepts as traps and unusual dangers, is a manifestation of the lamentable tendency to transmute propositions of fact into propositions of law, which Glanville Williams has called the 'besetting sin of the law of tort.' "

A writer in 18 Univ. of Kansas Law Review (1969), 161, 162, stated:

". . . [T]he existing exceptions and judicial extensions which pervade the common-law rules manifest a basic confusion surrounding the application of those rules and are symptomatic of an attempt to attain justice in the individual case while working within a system of law which frustrates the attainment of that end. This confusion and inequity in the area of occupier's liability stems from an attempt to apply old common-law principles in a society which no longer holds the landowner sacrosanct." Stites, Comment: *Liability of a Land Occupier to Persons Injured on His Premises: A Survey and Criticism of Kansas Law.*

The English Law Reform Committee Report, out of which grew the British revision eliminating the separate categories, concluded by saying:

"[The present law embarrasses justice] 'by requiring what is essentially a question of fact to be determined by reference to an artificial and irrelevant rule of law.' " Cited in McDonald & Leigh, *The Law of Occupiers' Liability and the Need for Reform in Canada,* 16 U. of Toronto Law Journal (1965), 55, 65.

The unsatisfactory condition of the common law was recognized by the legislature of Wisconsin as long ago as the enactment of the safe-place statute, sec. 101.11, Stats., first adopted by the legislature in 1911. The safe-place statute in effect abolished the traditional common-law classifications in respect to those who come upon public buildings and places of employment. The purpose of the safe-place statute was capsulized by Mr. Justice CROWNHART in a dissent to the majority opinion in *Lewko v. Krause Milling Co.* (1922), 179 Wis. 83, 94, 190 N. W. 924. He said in reference to the safe-place statute:

"In other words, it put into the statutes the humane doctrine of the courts, and wiped out the Draconian doctrine so far as licensees or invitees are concerned."

Despite the enlightened legislation adopted in 1911 applicable to public buildings and places of employment, this court has never seen fit to adopt the policy toward which the legislature led the way, but instead has continued to follow the unrealistic and Draconian rules referred to in *Lewko*.

This court in *McConville v. State Farm Mut. Automobile Ins. Co.* (1962), 15 Wis. 2d 374, 113 N. W. 2d 14, saw fit, however, to abolish the analogy of the licensor-licensee relationship in respect to the condition of an automobile in which a gratuitous guest may ride, and held that the licensor duty and its outgrowth—assumption of risk—should be discarded in favor of the principle that the driver of an automobile owes his guest the same duty of ordinary care that he owes to others. The *McConville Case* rested upon the rationale that the burden of injuries falling upon the community, as well as upon the individual injured parties, ought rather to be borne by the tort-feasor. *McConville* also placed heavy reliance upon the fact that automobile liability insurance was generally available to spread the cost of the risk. That factor is also present in respect to real property where

liability insurance is available to protect the property owner and those who come upon his premises. Moreover, it should be borne in mind that in *McConville* the court was dealing with a plaintiff who proceeded voluntarily in the face of a known risk. This is, of course, but rarely the situation in respect to either a licensee or an invitee on an occupier's property.

The reasoning of *McConville,* as applied to the occupier-of-land situation, means that both the occupier of land and one who comes upon it are charged with the duty of ordinary care, and even though the owner be found negligent, his liability may well be reduced by the negligence of the plaintiff under the familiar principles of our comparative-negligence law.

It would appear, therefore, that there is little to commend the continued use of the categories of licensee or invitee in respect to the liability of the occupier of property. As we have noted, the factual distinctions between licensees and invitees are hazy and the law blurred. There is no reason why one who invites a guest to a party at his home should have less concern for that guest's safety than he has for the welfare of an insurance man who may come to the home to deliver a policy. Is the life or welfare of a friend who comes as a guest to be more lightly regarded than the life or welfare of a casual business acquaintance? To state the question is to answer it. There is no good reason why the business guest should be afforded greater protection than the social guest. Particularly in Wisconsin, where the economic-benefit theory has been discarded in respect to invitees, no logical basis for any dichotomy remains.

While the common-law categories may have had some virtue under the feudal system of land tenures, when the lord of the land had complete and autocratic control of his property irrespective of harm to the community, such concept of land holding has long since vanished. We recognize numerous limitations upon the right to use

real property, most of which are imposed by the police power. An owner for many decades, in Wisconsin, has been unable to determine the use to which his property shall be put without reference to the needs of the community, usually expressed through police power zoning regulations. More recently, in *Just v. Marinette County* (1972), 56 Wis. 2d 7, 201 N. W. 2d 761, we have approved additional curtailment of the right of unbridled use of private property when it may affect the ecological balance of the area. The state's concern with the welfare of its citizens who may come by consent upon the property of another ought to be equally grave.

The only present merit that the rule in respect to licensees and licensors has is that it is old, and as Holmes said:

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Holmes, *The Path of the Law*, 10 Harvard Law Rev. (1897), 457, 469.

It is the tradition of common-law courts to reflect the spirit of their times and discard legal rules when they serve to impede society rather than to advance it. This principle, which has always been the guide of the courts, was well stated by Mr. Chief Justice WINSLOW in *Borgnis v. Falk Co.* (1911), 147 Wis. 327, 133 N. W. 209, in which the constitutionality of the workmen's compensation law was upheld. Although he spoke in reference to constitutional interpretation, the rationale is appropriate to any change in the common law. He said:

". . . the conditions and problems surrounding the people, as well as their ideals, are constantly changing. The political or philosophical aphorism of one generation is doubted by the next, and entirely discarded by the third; the race moves forward constantly, and no Canute can stay its progress." (P. 349)

In finding the workmen's compensation law constitutional, although the authors of our Wisconsin Constitution could not have dreamed of such legislation, Mr. Chief Justice WINSLOW went on to say:

"When an eighteenth century constitution forms the charter of liberty of a twentieth century government must its general provisions be construed and interpreted by an eighteenth century mind in the light of eighteenth century conditions and ideals? Clearly not. This were to command the race to halt in its progress, to stretch the state upon a veritable bed of Procrustes." (P. 349)

While we deal in this case not with a constitution, but with a venerable principle of the common law, the rationale for our departure from that outmoded creed remains the same. Whatever utility the dichotomy between licensors and licensees may once have had has long ago ended. The common-law process itself has preserved its viability only by the mending and shaping of substantially inapplicable principles to the case at hand. The exceptions to the rule and the difficulty in applying the rule demonstrate that the rule itself is worthless. As the Supreme Court of Massachusetts said in *Mounsey, supra,* pages 706, 707:

"We can no longer follow this ancient and largely discredited common law distinction which favors the free use of property without due regard to the personal safety of those individuals who have heretofore been classified as licensees. The problem of allocating the costs and risks of human injury is far too complex to be decided solely by the status of the entrant, especially where the status question often prevents the jury from ever determining the fundamental question whether the defendant has acted reasonably in light of all the circumstances in the particular case."

We therefore, on the basis of the analysis contained herein and assisted materially by the excellent and scholarly opinion of the trial judge, abolish the special immunities that heretofore applied to licensees and in-

vitees. The duty toward all persons who come upon property with the consent of the occupier will be that of ordinary care. By such standard of ordinary care, we mean the standard that is used in all other negligence cases in Wisconsin. Typical of such formulations is that appearing in *Osborne v. Montgomery* (1931), 203 Wis. 223, 236, 234 N. W. 372. *See also: Pfeifer v. Standard Gateway Theater, Inc.* (1952), 262 Wis. 229, 55 N. W. 2d 29; *Schilling v. Stockel* (1965), 26 Wis. 2d 525, 133 N. W. 2d 335. Under that test, as we have repeatedly stated, negligence is to be determined by ascertaining whether the defendant's exercise of care foreseeably created an unreasonable risk to others. That test is to be applied at the negligence phase of the analysis to the world at large and not to the particular plaintiff. In this respect, our analysis of negligence does not follow the Cardoza majority opinion in *Palsgraf v. Long Island R. R. Co.* (1928), 248 N. Y. 339, 162 N. E. 99. We rather rely upon the Andrews dissenting rationale that, if the defendant has been negligent under that standard, the question is one of cause—substantial factor, *i.e.*, cause in fact, and proximate cause, which may include policy factors that may exclude liability in the particular circumstances. Under the licensor-licensee, invitor-invitee rationale heretofore prevailing, were there a legal finding that there was no violation of duty of any kind to the entrant on the property, the question of contributory negligence did not arise. *Scheeler v. Bahr* (1969), 41 Wis. 2d 473, 164 N. W. 2d 310. Under the ordinary-care standard, which we hold to be applicable to the occupier of land, a duty of ordinary care falls also upon the entrant, and his negligence must be considered by the jury as in any other negligence case.

Although in this opinion we decline to go the full route followed by the trial judge and do not change the existing rule in respect to trespassers, the standard of ordinary care was properly imposed upon the defendant Reszczyn-

ski, and it was on the alleged violation of that duty to the plaintiff that the trial judge properly overruled the demurrer.

Although we apply the duty of ordinary care to the defendant in this case, in respect to all other defendants in similar circumstances, the duty shall be prospective only and affect only those cases in which injuries occur following the date of this mandate. *State v. Michels Pipeline Construction, Inc.* (1974), 63 Wis. 2d 278, 303b, 217 N. W. 2d 339, 219 N. W. 2d 308.[5]

*By the Court.*—Order affirmed.

---

[5] The dissent misstates the effect of the majority's opinion. The result of what the court does is not a merger of the licensee or invitee categories but the abolition of them as relevant legal distinctions. No category of licensee-invitee is created; both are discarded as determinative of liability. Ordinary tort law applies.

The dissent apparently asserts that there is a right to be unreasonably careless to social guests. It also overlooks, of course, numerous persons heretofore classified as licensees, frequently denied recovery under the ancient rules. Police and firefighters in the course of their duties are among those heretofore denied recovery. *See: Hass v. Chicago & North Western Ry. Co.* (1970), 48 Wis. 2d 321, 325, 179 N. W. 2d 885; Note, 52 Marquette Law Rev. (1969), 431. While denial of liability to these public servants is hardly rational, the situation is the direct result of the attempt to use ancient categories for modern conditions.

It is false to assert that the balancing of interests between land occupiers and those who come upon the land "has been up to now . . . a matter for legislative action." It has been wholly a matter of court-made common law, with the exception of the safe-place statute and the recreational-use statute; and, as the dissent states, the latter statute is obviously unaffected by this decision. The present chaotic condition of the law is the fault of the courts and not of the legislature. Courts have the initial responsibility to correct the ocmmon-law rules which they have established.

Moreover, the ringing and significant words of Lord Chatham would better and more correctly be employed by the dissenter in a case involving the trespass of state officials upon private property. The reference is to searches and seizures and is irrelevant to the duty toward one who enters by consent.

ROBERT W. HANSEN, J. *(dissenting)*. Two basic issues are raised by the majority opinion in this case:

(1) What is the proper balance between the rights and duties of host and guest when a social guest is injured on the premises of the host?

(2) Who is to do the balancing of the rights and duties involved—this court or the legislature?

The majority concedes that, up to now, the duty owed by the owner, lessee or occupant of land or living quarters to a social visitor has been ". . . limited to keeping the property safe from traps and to refraining from active negligence . . . ."[1]

The majority abandons this standard as to duty owed by host to guest and puts in its place the higher standard of "duty of ordinary care,"[2] adding a duty to inspect the premises in advance to the duty to warn of traps or concealed hazards.[3]

When a duty owed is thus broadened, somebody wins and somebody loses. Here every owner, every lessee and every occupant of land or living quarters loses by the greater exposure to liability. Every social guest, injured while on the premises of the host, gains in the broadened

[1] *Copeland v. Larson* (1970), 46 Wis. 2d 337, 341, 174 N. W. 2d 745.

[2] *Id.* at page 342.

[3] *Balas v. St. Sebastian's Congregation* (1975), 66 Wis. 2d 421, 426, 427, 225 N. W. 2d 428, this court stating: "At common law, the highest duty owed by an owner of land toward someone on the premises was that of ordinary care, owed to an invitee. This duty could be satisfied by alternative means. The landowner might either have his premises in a reasonably safe condition or give the invitee adequate and timely warning of latent and concealed perils which are known to the invitor but not to the invitee. Another way of stating this same proposition is that there is no duty to inspect and warn unless it is shown that the premises were not in a reasonably safe condition."

opportunity to seek and secure damages for the injury sustained.

The majority accomplishes placing a heavier burden on owners and occupiers of property in a two-stage operation:

(1) It abolishes the distinction between a business visitor, heretofore considered an invitee,[4] and a social visitor, heretofore considered to be a licensee.[5]

(2) It imposes, as to the new class of "invitee-licensee," not the lower duty owed to a social guest,[6] but the broader duty, heretofore owed only to business invitees.[7]

This dissent rests primarily on who—court or legislature—ought to do the balancing rather than on where a proper balance of rights and duties ought be struck. However, as to the first step of the two-step operation, it can be noted that the category of business visitor or invitee has shrunk to a shadow of its former self. With the passage of a safe-place statute in 1911, entrants onto public buildings, commercial establishments and places of employment came under the statute, no longer in the common-law category.[8] Left in the classification were hardly more than baby-sitters,[9] a doctor making a sick call or, as the majority suggests, ". . . an insurance man who may come to the home to deliver a policy." To merge the two categories, which the writer contends is

---

[4] *Copeland v. Larson, supra,* footnote 1, at page 342, this court holding: "To this court, the terms 'business invitee,' 'business visitor,' and 'invitee' are synonyms . . . ."

[5] *Flintrop v. Lefco* (1971), 52 Wis. 2d 244, 247, 190 N. W. 2d 140, this court holding: "At the time of the accident, the plaintiff was a social guest of the defendant and between them the duty owed was that of licensor to licensee."

[6] *See:* Footnote 1.

[7] *See:* Footnotes 2, 3.

[8] *See:* Sec. 101.11, Stats.

[9] *See: Schlicht v. Thesing* (1964), 25 Wis. 2d 436, 438–440, 130 N. W. 2d 763.

properly a matter for the legislature to consider and determine (as it did by enacting a safe-place statute), is here to do no more than place a pygmy and a giant in the same bed. However, that does not mean that the night-shirt that fit the pygmy is the one to be put on the giant.

Whether a homeowner or occupant of premises ought owe the same duty to a business visitor as to a social guest is one question. Answered affirmatively, it leaves entirely open the question of whether, the two combined, a lower duty is to be imposed as to business visitors or a higher duty imposed as to social guests. Opting for a wider exposure to liability on the part of owner or occupant, the majority sets forth its reasons concluding that placing a heavier burden as to liability on the host is appropriate. Such reasons appear to be four in number:

(1) *Consistent with Legislative Policy?* The majority finds its placing a higher duty on homeowners and house-holders as to social guests as consistent with the legislative policy expressed by enactment of the safe-place statute in 1911.[10] That reckons without the public policy expressed by the enactment of the duty-to-recreational-users statute in 1963.[11] This legislative enactment provided that in the absence of a "valuable consideration," the owner, lessee or occupant of premises ". . . owes no duty to keep the premises safe for entry or use . . ." as to persons coming on to the premises for certain recreational-type purposes, even if they have permission for entry from the possessor.[12] The legislature placed a very high duty on owners of public buildings, commercial establishments and places of employment. It established a very low duty of a landholder to persons, licensees or trespassers alike, who come on to the premises for the purposes listed in the statute. The majority opinion increases the disparity between the duty owed to a visitor

---

[10] Sec. 101.11, Stats.
[11] Sec. 29.68, Stats.
[12] *Id.*

or licensee who comes under the provisions of sec. 29.68, Stats., and a visitor who does not. Carrying out an evident legislative purpose can hardly be claimed for such result.

(2) *Times are A-Changing?* The times, they are a-changing, writes the majority, and common-law courts are ". . . to reflect the spirit of their times, . . ." including evidencing ". . . the state's concern with the welfare of its citizens who may come by consent upon the property of another. . . ." Concern for owners, lessees and occupants of premises is also a proper concern. That is what the legislature considered when it provided that an owner, lessee or occupant of premises, in absence of "valuable consideration," had no duty to keep the premises safe for ". . . hunting, fishing, trapping, camping, hiking, snowmobiling, berry picking, water sports, sightseeing or recreational purposes. . . ."[13] It evidences a state of concern as well for the welfare of those upon whose land the campers, hunters, snowmobilers, berry pickers, water sports enthusiasts and recreation seekers come. The majority's authority for moving in a contrary direction is based on a claimed ". . . additional curtailment of the right of unbridled use of private property, . . ." in a recent case dealing with police power zoning regulations related to the ecological balance of the area.[14] Not only did that case involve only the zoning or police power of the state, but any limitation on the rights or use of the property by its owner must be seen as reluctantly invaded because of the need to protect the environment, not enthusiastically abandoned. What had to be done there hardly supports what need not have been done here.

(3) *Escape from Feudalism?* The majority relates the control of property one owns or occupies and "the rule in

[13] *Id.*

[14] *Just v. Marinette County* (1972), 56 Wis. 2d 7, 201 N. W. 2d 761.

respect to licensees and licensors" to the feudal system of land tenure, ". . . when the lord of the land had complete and autocratic control of his property. . . ." The owner of an unimproved 40 acres in the north woods or the owner of a mortgage-encumbered house in city or village may be flattered by being compared to a lord of a feudal estate. The concept that "a man's home is his castle" has deeper roots, and can hardly be said, as the majority claims, to have "long since vanished," in the light of sec. 29.68, Stats., providing certain permitted entrants or users take the premises, as does the owner or occupant, as they find them.[15] It is true that the Magna Carta was wrung from a reluctant king by lords and nobles.[16] But that brake on the divine right of kings went far beyond an assertion of rights by the holders of large estates. It became the shield of protection for the humblest cottager as well as the holders of large estates.[17] As important, it became the foundation for the first ten amendments to our United States Constitution, and es-

[15] Thus sec. 29.68, Stats., gives to certain entrants with permission no greater landowner duty than that owed to trespassers. See: *Copeland v. Larson, supra*, footnote 1, at page 341, this court summarizing the common-law rule as to landowner liability to trespassers as follows: "He [the owner of the land] is not liable for injury to trespassers, as a general rule, caused by his failure to exercise reasonable care to put his land in safe condition for them, nor is he obliged to refrain from operations or activities that might cause injury [text authority cited], at least until the trespasser is discovered."

[16] *See generally*, Holt, *Magna Carta* (Cambridge University Press, 1965), ch. VI.

[17] "The poorest man may in his cottage bid defiance to all the force of the Crown. It may be frail, its roof may shake; the wind may blow through it; the storms may enter,—the rain may enter,—but the King of England cannot enter; all his forces dare not cross the threshold of the ruined tenement!" William Pitt (Earl of Chatham)—*Speech on the Excise Bill.* Roberts, *Hoyt's New Cyclopedia of Practical Quotations* (Funk & Wagnalls Company, 1923), at page 371.

pecially the ninth amendment.[18] Whatever balance is struck between rights and duties of landowners and person permitted on premises, feudalism has little to do with the balancing of the factors to be considered.

(4) *Why Not the Same?* The majority rhetorically asks whether the welfare of one who comes as a guest is to be more lightly regarded than the welfare of a casual business acquaintance, and answers: "There is no good reason why the business guest should be afforded greater protection than the social guest." The answer begs the question. As to the duty to be owed by the host to both, the question is not whether a difference in treatment is warranted but what is the duty of the host to be as to both social guest and business visitor. The majority does not discuss the difference between the duty heretofore owed to a business visitor, and as compared to the duty heretofore owed to a social guest. The additional burden, now imposed by the majority as to both business visitor and social guest, appears to be that of a duty of prior inspection so that either the premises are in a safe condition or visitors can be warned of latent or concealed hazards.[19] With no specific reason stated by the majority as to why the higher duty, not the lower, is found to be appropriate, it is difficult to join issue as to which standard should be here applied. A case for a choice of the alternative option can be made. Obviously, it would include the regressive nature of the widened exposure to liability of owner or occupant to a guest that is being mandated. The property or *ad valorem* tax has been criticized as regressive, but it at least is related to the value of the property owned. Here the owner of a small cottage has the same risk of added liability as does the owner, free and clear, of a mansion. The lessee or renter

[18] Art. IX, U. S. Const., providing: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

[19] *See:* Footnote 3.

of a small apartment has as great a risk of added liability to a guest as does the owner of an expensive split-level home. Guests are as likely to slip on a throw rug on a bathroom floor in humble surroundings as in the plushest of living arrangements. However, this dissent goes more to who should do the balancing, not to where the balance point is placed. So the dissent need go no further here than to point out that a persuasive case for choosing the higher standard as to the duty owed by a householder host to his social guest has not here been established.

As to the second question raised by this appeal—Who is to do the balancing of the rights and duties here involved?—the writer submits that a broadened liability of owners, lessees and occupants of premises to social guests should result from legislative action, not judicial edict.

After this majority holding, as before, it will continue to be true that the duty of a possessor or owner of property with respect to those who come upon his premises will vary with the legal status of the person who suffers an injury on the premises. True it is that this variance as to duty owed derives from the common-law delineations of the statuses of trespasser, licensee and invitee. However, for nearly three-quarters of a century, the only changes made as to such categories or the duty owed as to each have been made in this state by its legislature. There are two such changes, legislatively enacted:

(1) *The Safe-Place Statute.* Enacted in 1911, this statute changed the duty owed by owners of public buildings and places of employment to persons coming on such premises to the duty to ". . . so construct, repair or maintain such place of employment or public building as to render the same safe."[20]

(2) *Liability of Landowners Statute.* Enacted in 1963, this statute provides that, as to persons given permission for entry but not for a valuable consideration: "An

[20] Sec. 101.11, Stats.

owner, lessee or occupant of premises who gives permission to another to hunt, fish, trap, camp, hike, snowmobile, sightsee, berry pick or to proceed with water sports or recreational uses upon such premises does not thereby extend any assurance that the premises are safe for such purpose, or constitute the person to whom permission is granted an invitee to whom a duty of care is owed. . . ."[21] Whether narrowly construed or not, this statute clearly establishes a group of licensees or guests to whom no standard of host care is applicable, and to which the majority's establishment of such standard of care as to guests or licensees does not apply.[22]

With the only changes in the common-law standard of landowner or occupier liability to those who come upon his premises thus made by the legislature, the writer would see the merging of the categories of business visitor and social guest, except as sec. 29.68, Stats., applies, as well as the choice of the appropriate standard as to duty owed to the partially-combined "invitee-licensee" class to be a matter for the legislature to consider and determine. Something more than continued deference to the legislative branch to do the balancing of the rights and interests involved and to determine an appropriate public policy is involved.

In part, the writer's conclusion that only legislative action is here appropriate, rests on the tripartite nature

---

[21] Sec. 29.68 (2), Stats.

[22] See: Copeland v. Larson, supra, footnote 1, at page 343, this court holding: "An examination of sec. 29.68, Stats., indicates the landowner owes the ordinary duty of reasonable care to those entering upon his land for certain recreational purposes only if the permission to enter the land is granted for a valuable consideration. To a licensee the liability for 'traps' and 'active negligence' was altered by this statute to a liability for 'willful or malicious failure to guard or to warn against a dangerous condition, use, structure or activity,' and therefore the statute is in derogation of the common law and requires a strict construction."

of our government, with its division of authority for the conduct of public affairs between three coordinate branches of government, *i.e.*, legislative, executive and judicial.[23] This has been termed a system of "checks and balances," with the legislative branch to set the public policy, the executive branch to administer the public policy thus set, and the judicial branch to interpret such public policy enactment and to test its being within constitutional limits.[24] However, more is involved than "checks and balances" upon any one branch of government seeking to alone determine, administer and review what is to be the public policy.

The wisdom and vision of the founders of this republic enabled them to see the setting of public policy as most satisfactorily and democratically accomplishable by the legislative branch, the administering of such policy as best conducted by the executive branch and the review and interpreting of such public policy as best done by the judicial branch. The case before us is a classic illustration of why this is so. Here is involved a balancing, or a re-balancing, of the respective rights and duties of

---

[23] *See:* Art. I, U. S. Const., as to legislative powers; Art. II, as to executive powers; and Art. III, as to judicial powers. *See also:* Art. IV, Wis. Const., as to the legislative power, Art. V, as to the executive power; and Art. VII, as to the judicial power.

[24] *See:* *State ex rel. Broughton v. Zimmerman* (1952), 261 Wis. 398, 405, 52 N. W. 2d 903, overruled on other grounds, *State ex rel. Reynolds v. Zimmerman* (1964), 22 Wis. 2d 544, 126 N. W. 2d 551, where the court stated: " 'The legislative department determines what the law shall be, the executive department executes or administers the law, and the judicial department construes and applies the law. Neither one of these departments can arrogate to itself any control over either one of the other departments in matters which have been solely confided by the constitution to such other department.' " *See also: Department of Revenue v. Nagle-Hart, Inc.*, ante, p. 224, 226, 234 N. W. 2d 350, this court holding: "It is not the function of the tax department to locate, define and enforce an appropriate public policy. That is the law-making function of the state legislature."

those who own, lease or occupy land or home, and of the rights and duties of those who enter on such land or home and are injured. If striking the balance between the rights and interests involved were left, as it has been up to now, as a matter for legislative action, those individuals and groups who identify with the entrants upon premises who sustain injury (or who believe that everybody everywhere owes to everybody else a standard of ordinary care) would appear at committee meetings, write to their assemblymen and state senators, and seek public support for their point of view. Similarly, those who identify with the owner, lessee or occupant of premises (or who believe that home ownership ought not be saddled with additional burdens or liabilities) would do exactly the same, seeking to have their point of view made the law of the state. Such legislative process, while it may have its detractors, insures the widest possible input of individuals or groups affected or concerned in the establishment of an appropriate public policy on issues of public concern.

In contrast, when resort, as here, is to the courts to do the balancing of the rights and interests involved (with the court to locate and establish the appropriate public policy), there is no way of providing any similar opportunity for public participation in the decision-reaching process. Here we have before us, as did the trial court, only the slender briefs and brief oral arguments of the attorney for the plaintiff and the attorney for the defendant. In one brief-enough court opinion conference a vote of the seven justices was taken, and, by majority vote, a result is reached that determines the public policy and affects the rights and duties of very nearly all of the citizens of our state. Where the vote is four-to-three, this means that one member of this court has decided where the balance is to be struck between the contending rights, duties and interests of two large segments of our citi-

zenry. That is indeed a fragile basis for deciding an issue of public policy in a democratic republic, and particularly so in an area of concern that has traditionally been one considered a part of the legislative, not the judicial, process.

As to the general matter of this court altering long-established common-law or court-made rules or standards, our court recently held:

> " 'Moreover, we have made it clear that this court, in general, would depart from *stare decisis* only where unintentional conduct was involved and then *only when there were compelling reasons for altering a court-made rule. Estate of King* (1965), 28 Wis. (2d) 431, 137 N. W. (2d) 122. In *Wilcox v. Wilcox* (1965), 26 Wis. (2d) 617, 623, 133 N. W. (2d) 408, we pointed out our reluctance to deviate from precedent where rules of contract or property were involved.' " (Emphasis supplied.) [25]

In the writer's opinion, such compelling reasons do not here exist for altering the common-law rule, either as to a partial merger of "invitee" and "licensee" categories or in selecting an appropriate standard of duty to be owed by owners, lessees and occupants to the "invitees-licensees." So the writer would reverse, finding the complaint demurrable for failure to allege a breach of the duty owed by the defendant-host to the plaintiff-social guest, with leave granted to the plaintiff to plead over if a cause of action for active negligence or failure to keep the property safe from a trap or concealed hazard can be and is pleaded.[26]

---

[25] *State v. Michels Pipeline Construction, Inc.* (1974), 63 Wis. 2d 278, 296, 217 N. W. 2d 339, 219 N. W. 2d 308, quoting from *Gottlieb v. Milwaukee* (1967), 33 Wis. 2d 408, 431, 147 N. W. 2d 633.

[26] Footnote 5 of the majority opinion states that the "result of what the court does is not a merger of the licensee or invitee categories but the abolition of them as relevant legal distinctions." This cannot be done completely because of sec. 29.68, Stats. *(See:*

I am authorized to state that Mr. Justice LEO B. HANLEY and Mr. Justice CONNOR T. HANSEN join in this dissent.

Footnote 11.) To the extent that it can be partially accomplished, it creates a new class that can be termed either "invitee-licensee" or "nontrespasser." To such nontrespassers (not covered by sec. 29.68) the majority applies ". . . the highest duty owed by an owner of land towards someone on the premises. . . ." Even under this "highest duty," heretofore applied only to invitees, it is to be noted that this complaint is still demurrable because it does not allege that the condition was "latent or concealed." (See: Footnote 3.) The complaint alleges the icy patch plaintiff slipped on was known to the defendant. If the condition was concealed, the defendant had the same duty to warn the plaintiff whether he was a licensee or an invitee. (See: Szafranski v. Radetzky (1966), 31 Wis. 2d 119, 126, 141 N. W. 2d 902 and footnote 3.) Since a defendant landowner has no duty to warn of a condition that is not latent or concealed, the failure to allege the latency or concealment of the condition is fatal, and the complaint is demurrable. See: Schutt v. Schmid (1973), 60 Wis. 2d 173, 175, 208 N. W. 2d 306, the court holding, in reference to a licensor-licensee situation where concealment of the condition is also a prerequisite for the landowner's duty to warn: "Since there is no allegation that the condition was concealed, the demurrer to the complaint should have been sustained."